CC-2000-318                                             1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Jarra Corporation<br>        Recurrida<br><br>            v.<br><br>Axxis Corporation<br>        Peticionaria | Certiorari<br><br>2001 TSPR 162<br><br>155 DPR _____ |

Número del Caso: CC-2000-318


Fecha: 30/noviembre/2001


Tribunal de Circuito de Apelaciones:
                           Circuito Regional I


Juez Ponente:
                     Hon. Guillermo Arbona Lago


Abogado de la Parte Peticionaria:
                     Lcdo. Antonio J. Amadeo Murga


Abogado de la Parte Recurrida:
                     Lcdo. Hiram Martínez López



Materia:  Acción Civil



Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Jarra Corporation

    Recurrida

       v.

                            CC-2000-318      Certiorari

Axxis Corporation

    Peticionaria

**Opinión del Tribunal emitida por el Juez Asociado señor Rivera Pérez.**

San Juan, Puerto Rico, a 30 de noviembre de 2001.

El presente recurso versa sobre un contrato de distribución que fue cancelado por el principal, quien alegó justa causa para ello. Nos corresponde determinar si el distribuidor está obligado a pagar una deuda que contrajo con su principal por concepto de compra de un equipo, y si éste impidió voluntariamente que se cumpliera la condición suspensiva a la cual estaba sujeta tal obligación. Debemos, además, determinar si el distribuidor aquí recurrido incurrió en conducta temeraria que conlleve la imposición de honorarios de abogado. Veamos.

I

Jarra Corporation, en adelante Jarra, es una corporación organizada bajo las leyes de Puerto Rico, con oficinas en San Juan, Puerto Rico.[1] Axxis Corporation, en adelante Axxis, es una corporación organizada bajo las leyes del estado de Florida.[2] Originalmente se llamaba Southeast Information Retrieval Systems, Co. (SIRS) y sus productos se mercadeaban bajo el nombre de "Archival Express".[3] El 31 de agosto de 1992, Jarra y SIRS otorgaron un contrato de distribución, al amparo del cual Jarra se convirtió en distribuidor exclusivo en Puerto Rico, República Dominicana, Islas Vírgenes y San Martín de los sistemas de almacenaje y recuperación de datos producidos por SIRS.[4] Jarra entró en esta relación contractual, porque entendió que el "Archival Express" era un producto innovador, con tecnología avanzada y que, según sus estudios de mercado, en Puerto Rico habían cerca de cuatro mil (4,000) clientes potenciales.[5] Como parte del contrato de distribución, Jarra adquirió uno de los equipos de Axxis por el precio de treinta y cinco mil dólares ($35,000). Jarra realizó un pago inicial de veinte mil dólares ($20,000) y pactó con Axxis el pago del remanente, ascendente a la suma de quince mil dólares ($15,000), cuando vendiera la primera unidad del equipo.[6] El equipo comprado por Jarra era el más avanzado en el mercado. El mismo podía utilizarse para promoción y para cualquier otro uso.[7] Jarra utilizó tal equipo desde 1992 hasta luego de la terminación de la relación contractual entre las partes. En el año 1996 ofreció devolverlo a Axxis, pero nunca lo hizo.[8]

---

[1] Apéndice II del recurso de Certiorari, pág. 3.

[2] Íd.

[3] Íd.

[4] Íd.

[5] Apéndice III, Íd., pág. 84.

[6] Apéndice II, Íd., pág. 3.

[7] Apéndice III, Íd., pág. 49.

[8] Íd., pág. 51.

El contrato estableció un estándar mínimo de cumplimiento, que consistía en la venta de al menos cinco (5) equipos, entre el 1 de septiembre de 1992 y el 31 de agosto de 1993.[9] Jarra no pudo adiestrar a su personal en el uso del sistema producido por SIRS, porque tenía un compromiso contractual con la Comisión Estatal de Elecciones relacionado con las elecciones generales celebradas en el mes de noviembre de 1992.[10] El equipo de SIRS llegó a Puerto Rico a principios de noviembre de 1992. Para esa fecha, los empleados de Jarra no habían recibido adiestramiento alguno sobre el uso y la promoción de ese tipo de equipo.[11] Las partes hicieron un arreglo para que el personal de SIRS viniera a Puerto Rico a adiestrar los empleados de Jarra, lo cual se llevó a cabo los días 14, 15 y 16 de febrero de 1993. En el adiestramiento participaron los empleados de Jarra, incluyendo técnicos y vendedores.[12]

En febrero de 1993, Jarra comenzó algunos esfuerzos de promoción del sistema distribuido por SIRS, que incluyeron anuncios en periódicos y una actividad social en que se invitó a clientes potenciales. La misma se celebró el 16 de febrero de 1993 en el restaurante El Zipperle, ubicado en Hato Rey.[13] Surge de los autos de este caso que Jarra gestionó algunos comunicados de prensa sobre el producto y participó en algunas subastas con agencias del gobierno. En marzo de 1993, Jarra fue informado de que SIRS cambió su nombre a Axxis y que el equipo que se distribuía como "Archival Express" también cambió su nombre por el de Axxis.[14] A pesar de ser el distribuidor de tales equipos desde septiembre de 1992, Jarra no realizó venta alguna del sistema Axxis durante los años 1992, 1993, 1994 y 1995. Durante la segunda parte del año 1994 y el 1995, Jarra no realizó esfuerzo promocional alguno para ese sistema y tuvo una escasa comunicación con

---

[9] Apéndice II, Íd. pág. 4.

[10] Íd.

[11] Íd.

[12] Íd.

[13] Íd.

Axxis.[15] Durante dicho período de tiempo, los distribuidores de Axxis en otras jurisdicciones lograron vender el producto. Jarra no demostró haber podido vender el producto ni haber desarrollado una clientela para el mismo.[16] El 25 de mayo de 1995, Axxis le notificó a Jarra la cancelación del contrato de distribución, efectivo el 31 de agosto del mismo año.[17]

Axxis le propuso a Jarra la otorgación de un contrato de "master reseller license in agreement renewal", mediante el cual Axxis podría vender directamente, o a través de otros distribuidores, sus productos en la región comprendida en el contrato, pero pagando una comisión a Jarra por cada venta.[18] Jarra rechazó la oferta y radicó una demanda por violación a la Ley Núm. 75 de 24 de junio de 1964,[19] el 29 de agosto de 1996,[20] alegando que Axxis le había cancelado el contrato de distribución sin justa causa. Por su parte, Axxis contestó la demanda y presentó una reconvención contra Jarra el 31 de enero de 1997.[21] En la contestación a la demanda negó las alegaciones y sostuvo que tenía justa causa para la cancelación del contrato. Mediante la reconvención solicitó el pago por los quince mil dólares ($15,000) adeudados por Jarra y el resarcimiento por daños. El 5 de febrero de 1997, Axxis le solicitó al Tribunal de Primera Instancia que dictara una orden provisional contra Jarra para que continuara durante la vigencia del pleito la relación contractual entre las partes.[22] Jarra se opuso a dicha solicitud alegando que le había perdido la confianza a Axxis.[23] Luego de celebrarse el juicio, el Tribunal de Primera Instancia dictó sentencia el 8 de marzo de 1999, archivándose en autos copia de su notificación el 7 de abril de

---

[14] Íd.

[15] Íd., pág. 5.

[16] Apéndice III, Íd., pág. 49.

[17] Íd., pág. 87.

[18] Íd.

[19] 10 L.P.R.A. sec. 278 et seq.

[20] Apéndice III del recurso de Certiorari, pág. 38.

[21] Íd., pág. 43.

[22] Apéndice XIV, Íd., pág. 141.

1999.[24] Concluyó el foro de primera instancia que no procedía la demanda presentada por Jarra y declaró con lugar la reconvención de Axxis, en cuanto al pago de los quince mil dólares ($15,000) adeudados. Determinó dicho foro que Axxis tenía justa causa para cancelar el contrato ante la falta de ventas y esfuerzos promocionales por parte de Jarra durante el tiempo que duró la relación contractual, y que la cantidad adeudada a Axxis por la compra del equipo debía ser pagada, ya que tal obligación era una sujeta a condición suspensiva, la cual no se cumplió por las acciones del obligado, o sea, Jarra.[25]

Ambas partes recurrieron oportunamente al Tribunal de Circuito de Apelaciones vía recurso de apelación. Ese foro apelativo intermedio dictó sentencia el 29 de febrero de 2000, archivándose en autos copia de su notificación el 8 de marzo de 2000.[26] Dicha sentencia revocó la dictada por el Tribunal de Primera Instancia, en aquella parte que condenó a Jarra al pago de los quince mil dólares ($15,000), y confirmó el resto.

El 4 de abril de 2000, Axxis recurrió ante este Tribunal mediante recurso de _Certiorari_ imputándole al foro apelativo intermedio la comisión de los errores siguientes:[27]

I. ERRÓ EL HONORABLE TRIBUNAL DE CIRCUITO DE APELACIONES AL REVOCAR LA PARTE DE LA SENTENCIA DEL TRIBUNAL DE PRIMERA INSTANCIA QUE HABÍA ESTIMADO LA RECONVENCIÓN DE AXXIS POR EL BALANCE DIFERIDO DE $15,000.00 QUE ADQUIRIÓ JARRA DE AXXIS Y QUE DEBÍA SER PAGADO AL CONSUMAR JARRA LA PRIMERA VENTA DE LOS EQUIPOS DE AXXIS A SER DISTRIBUIDOS POR JARRA, A PESAR DE QUE JARRA NO HIZO ESFUERZOS RAZONABLES POR CASI TRES AÑOS PARA VENDER EL PRODUCTO DE AXXIS.

II. ERRÓ EL HONORABLE TRIBUNAL DE CIRCUITO DE APELACIONES AL CONFIRMAR LA DENEGATORIA DE HONORARIOS A LA PARTE DEMANDADA RECURRENTE POR PARTE DEL TRIBUNAL DE PRIMERA INSTANCIA A PESAR DE QUE LA DEMANDANTE RECURRIDA HABÍA ACTUADO TEMERARIAMENTE AL INOCAR LA ACCIÓN DE DAÑOS BAJO LA LEY 75 SIN HABER VENDIDO UN SÓLO (SIC) PRODUCTO DE SU PRINCIPAL, SIN HABER HECHO GESTIONES RAZONABLES PARA VENDER EL PRODUCTO POR CASI TRES AÑOS Y HABIENDO RECHAZADO LAS OFERTAS HECHAS POR LA DEMANDADA RECURRENTE ANTES DEL PLEITO DE QUE CONTINUARA COMO DISTRIBUIDOR ASÍ COMO LAS QUE SE HICIERON LUEGO DE COMENZADO EL PLEITO.

---

[23] Apéndice XV, Íd., pág. 144.

[24] Apéndice III, Íd., pág. 81.

[25] Íd.

[26] Apéndice I, Íd., pág. 1.

[27] Véase recurso de _Certiorari_, págs. 6-7.

Estando perfeccionado el recurso, resolvemos.

II

En Puerto Rico rige la libertad de contratación. Esto significa que, salvo las restricciones que establece la ley, las partes contratantes pueden establecer los acuerdos que estimen convenientes. Esta libertad de contratación la establece el Artículo 1207 del Código Civil,[28] el cual dispone lo siguiente:

> Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público.

De la misma forma, una vez se perfecciona un contrato las partes quedan obligadas a cumplir con los términos del mismo y con todas las consecuencias naturales de dicho contrato que no sean contrarias a la ley, al uso y costumbre ni a la buena fe.[29]

Jarra alega que no está obligada a pagar la cantidad de quince mil dólares ($15,000) adeudada a Axxis, porque no pudo vender ninguno de los equipos de dicha compañía. Para la evaluación y consideración de tal alegación, es menester analizar la naturaleza de la obligación contraída por Jarra. Veamos.

El Artículo 1066 del Código Civil,[30] dispone lo siguiente:

> Será exigible desde luego toda obligación cuyo cumplimiento no dependa de un suceso futuro o incierto, o de un suceso pasado, que los interesados ignoren.
>
> También será exigible toda obligación que contenga condición resolutoria, sin perjuicio de los efectos de la resolución.

El referido estatuto establece la norma general de que las obligaciones son exigibles inmediatamente. Sin embargo, existen excepciones a esta regla general que son las llamadas obligaciones condicionales. En estas obligaciones las partes adquieren o pierden derechos, dependiendo de la

---

[28] 31 L.P.R.A. sec. 3372.

[29] Íd., sec. 3375.

[30] Íd., sec. 3041.

ocurrencia del acontecimiento que constituya la condición.[31]  El elemento característico de estas obligaciones condicionales es la incertidumbre de si el vínculo jurídico adquirirá eficacia o la perderá por razón de cumplirse un hecho futuro e incierto, o del conocimiento de un hecho pasado, cuya ocurrencia se desconocía.[32]  Dentro de las obligaciones condicionales se encuentran las llamadas obligaciones sujetas a una condición suspensiva. Las mismas tienen la particularidad de que su eficacia depende de que se cumpla un hecho futuro e incierto.  Si se cumple esa condición cobra eficacia la obligación, si no se cumple, las partes quedan liberadas de la misma.[33] A esos efectos, el Artículo 1070 del Código Civil[34] dispone que "[l]a condición de que ocurra algún suceso en un tiempo determinado extinguirá la obligación desde que pasare el tiempo, o fuere ya indudable que el acontecimiento no tendrá lugar".  Hemos resuelto que en el caso de las obligaciones sujetas a una condición suspensiva, se extingue y desaparece el vínculo entre las partes si no se cumple dicha condición, y no se pueden exigir las prestaciones hasta tanto se haya cumplido la misma.[35]

Al amparo de las disposiciones legales y principios doctrinales expuestos, pasemos a determinar si la obligación contraída por Jarra era una sujeta a condición suspensiva.  Jarra se obligó a pagar a Axxis la suma adeudada de quince mil dólares ($15,000), cuando vendiera el primer equipo de los fabricados por Axxis.  Concluimos que la obligación del distribuidor (Jarra) quedó sujeta a una condición de naturaleza suspensiva, ya que al momento de establecerse la misma las partes desconocían si éste podría vender alguno de los equipos.  Por lo tanto, había incertidumbre en cuanto a la ocurrencia del evento.  Y, además, era futura, porque el mismo podría

---

[31] Artículo 1067 del Código Civil, 31 L.P.R.A. sec. 3042.

[32] J. Castán Tobeñas, Derecho Civil Español, Común y Foral, Decimosexta Edición, Madrid: Reus, S.A., 1992, Tomo 3; J. Puig Brutau, Fundamentos de Derecho Civil, Tercera Edición Revisada, Barcelona: Bosch, 1985, Tomo I, Vol. II; J.R. Vélez Torres, Derecho de Obligaciones, Curso de Derecho Civil, Segunda Edición, San Juan: Universidad Interamericana de Puerto Rico, 1997.

[33] Íd.

[34] 31 L.P.R.A. sec. 3045.

ocurrir luego de contraerse la obligación.  Ahora bien, ¿se libera de su obligación Jarra por no haberse cumplido la condición suspensiva? Contestamos dicha interrogante en la negativa.

Como mencionáramos anteriormente, si la condición suspensiva no se concretiza la obligación no cobra eficacia y las partes quedan liberadas. No obstante, según nuestro Código Civil, una obligación sujeta a una condición suspensiva será nula si el cumplimiento de la condición queda al arbitrio de uno de los obligados.  A esos efectos, el Artículo 1068 del Código Civil[36] dispone lo siguiente:

> Cuando el cumplimiento de la condición dependa de la exclusiva voluntad del deudor, la obligación condicional será nula.  Si dependiere de la suerte o de la voluntad de un tercero, la obligación surtirá todos sus efectos con arreglo a las disposiciones de este título.

Aunque la letra de este artículo menciona que la obligación sujeta a condición suspensiva es nula cuando su cumplimiento queda al arbitrio del deudor, autores como Puig Brutau y Vélez Torres sostienen que esta disposición se extiende también al acreedor, porque el cumplimiento de los contratos no puede quedar al arbitrio de uno de los contratantes.[37]  El Artículo 1068 del Código Civil, _supra_, se refiere a lo que reconoce la doctrina como condiciones potestativas, las cuales se dividen en las rigurosamente potestativas y las simplemente potestativas.  Las primeras dejan al arbitrio del obligado el cumplimiento de la obligación y, por lo tanto, la obligación es nula, porque no se establece un verdadero vínculo obligacional.[38]  Sobre este tema señala Puig Brutau[39] lo siguiente:

> Es natural que el hecho incierto del que depende la eficacia de la obligación tenga que producirse con independencia de la voluntad de las partes.  Si sólo dependiera de la voluntad de una de ellas, la incertidumbre recaería sobre la decisión de esta parte.  En consecuencia, si se tratara del deudor, éste en realidad no estaría obligado, pues no cabe

---

[35] _Mercedes Bus Line v. Rojas_, 70 D.P.R. 540 (1949); _Meléndez v. Jiménez Realty, Inc._, 98 D.P.R. 892 (1970).

[36] 31 L.P.R.A. sec. 3043.

[37] Véase Puig Brutau, _op. cit._, y Vélez Torres, _op. cit._

[38] Íd.

[39] Puig Brutau, _op. cit._, pág. 95.

afirmar que lo esté una persona cuya obligación depende de que efectivamente manifieste querer estar obligada.

Hemos expresado que la eficacia de un contrato no puede quedar a merced de la voluntad de una de las partes, porque se trataría de una condición potestativa, las cuales están vedadas por el Artículo 1068 del Código Civil, supra.[40]  Sin embargo, debemos tener en cuenta que la doctrina delinea una distinción entre las condiciones rigurosamente potestativas, las cuales dejan la validez de la obligación al exclusivo arbitrio de una de las partes, y las simplemente potestativas, en las cuales el cumplimiento de la condición no está sujeto al total arbitrio de una de las partes.[41]  La doctrina postula que las condiciones simplemente potestativas no tienen el efecto de anular la obligación que está sujeta a las mismas.[42]  La razón para esto es que el arbitrio de la parte, a cuya merced se encuentra el cumplimiento de la obligación, no es absoluto.[43]  A esos efectos, señala Puig Brutau[44] lo siguiente:

> Pero otra cosa sin duda ha de suceder cuando la obligación depende de que el obligado adopte una decisión que suponga cierto esfuerzo o sacrificio para el mismo.  Aunque la condición dependa del deudor, si no es puramente potestativa, sino que depende de que su conducta se sujete a un curso determinado, la condición no ha de producir el mismo efecto de anular la obligación que de ella dependa.  No existirá obligación cuando una persona se limite a decir a otra que le venderá su casa si se decide hacerlo, pero otra cosa sucederá si lo que la primera dice a la segunda es que le venderá su casa si le trasladan de residencia.  En este caso, como dice CASTÁN, la condición potestativa se aproxima a la llamada condición mixta.  Ya no se trata de algo que dependa del puro arbitrio del obligado, sino de un acto cuya realización limita la libertad jurídica de quien entonces ha de considerarse verdaderamente obligado.

En casos en que el cumplimiento de la condición potestativa no dependa del puro arbitrio de una de las partes, esa condición no anula la obligación.

---

[40] Albizu v. Royal Bank of Canada, 46 D.P.R. 503 (1934).

[41] Puig Brutau, op. cit.; Castán Tobeñas, op. cit.; Vélez Torres, op. cit.

[42] Íd.

[43] Íd.

[44] Puig Brutau, op. cit., pág. 97.

Según mencionáramos anteriormente, la disposición del Artículo 1068 del Código Civil, supra, establece la nulidad de las obligaciones cuando están exclusivamente sujetas a una condición rigurosamente potestativa.[45] Esta conclusión se desprende de la segunda oración de dicho artículo que dispone que la obligación sujeta a condición suspensiva es válida si el cumplimiento de la condición depende del azar o de la voluntad de un tercero. Por lo tanto, en el texto de dicha disposición estatutaria está reconocida de manera implícita la validez de las obligaciones que están sujetas a una condición simplemente potestativa.

Concluimos que la obligación contraída por Jarra a favor de Axxis contiene una condición suspensiva que se clasifica como simplemente potestativa. A pesar de que la venta de los productos de Axxis quedó al arbitrio de Jarra, su curso de acción estuvo limitado por la demanda que pudiera existir para dichos productos. Después de realizadas por Jarra las escasas gestiones promocionales, no logró vender ninguna unidad.[46] Aún cuando Jarra tuvo alguna intención de vender los equipos de Axxis, sería imposible lograrlo si los compradores no presentan interés a sus acercamientos. Jarra tuvo la intención de quedar obligado y, como consecuencia de su obligación, estaba forzada a realizar los esfuerzos necesarios y razonables para cumplirla. El Artículo 1072 del Código Civil[47] dispone que "[s]e tendrá por cumplida la condición cuando el obligado impidiese voluntariamente su cumplimiento". ¿Impidió voluntariamente Jarra el cumplimiento de la obligación suspensiva? Entendemos que sí. Veamos.

Nos persuade lo resuelto por el Tribunal Supremo del estado de Luisiana, en el caso de Alliance Financial Services, Inc. v. Cummings,[48] a los efectos

---

[45] Vélez Torres, op. cit.

[46] Como mencionáramos anteriormente, las gestiones consistieron en anuncios de periódico, cartas a clientes potenciales, una actividad social y licitaciones en algunas subastas gubernamentales.

[47] 31 L.P.R.A. sec. 3047.

[48] 526 So. 2d 324 (La. App. 4 Cir., 1988).

de que las partes sujetas a una obligación con condición suspensiva tienen que realizar esfuerzos de buena fe suficientes para cumplir sus prestaciones. Si no lo hacen, no pueden invocar la no ocurrencia de la condición como defensa para desligarse de su obligación. En iguales términos se había expresado dicho Tribunal en el caso de Dapremont v. Crossley,[49] donde se resolvió que una de las partes contratantes tenía la obligación de realizar los esfuerzos necesarios y de buena fe para conseguir un préstamo hipotecario y que su incumplimiento con esa obligación le impedía tratar de liberarse del contrato, a pesar de que la obtención de dicho financiamiento era una condición suspensiva del mismo.

Nos corresponde determinar si Jarra realizó esfuerzos razonables y de buena fe para cumplir con los términos de su obligación. ¿Cuáles eran sus obligaciones bajo el contrato?

No podemos perder de vista que estamos ante un contrato de distribución existente entre Axxis y Jarra, en el cual éste último es el distribuidor de los productos fabricados por el primero. La esencia de este contrato es el desarrollo de un mercado favorable y una clientela para los productos del principal por parte del distribuidor.[50] De hecho, hemos resuelto que la función de un distribuidor es la de crear un mercado favorable y desarrollar una clientela para los productos que distribuye.[51] El incumplimiento con el desarrollo de esa clientela y del mercado para el producto, constituye justa causa para la terminación de un contrato de distribución.[52] Para la creación de ese mercado favorable es esencial la publicidad, la promoción y la coordinación del mercadeo de dichos productos.[53]

---

[49] 367 So. 2d 127 (La. App., 1979).

[50] Oliveras, Inc. v. Universal Ins. Co., 141 D.P.R. 900 (1996); Cobbos Liccia v. DeJean Packing Co., Inc., 124 D.P.R. 896 (1989); y Roberco, Inc. y Colón v. Oxford Inds., Inc., 122 D.P.R. 115 (1988).

[51] Roberco, Inc. y Colón v. Oxford Inds., Inc., supra.

[52] Oliveras, Inc. v. Universal Ins. Co., supra.

[53] Cobbos Liccia v. DeJean Packing Co., Inc., supra.

Jarra no cumplió cabalmente su obligación bajo el contrato de distribución. De las determinaciones de hechos del Tribunal de Primera Instancia, con las cuales no intervendremos por no haberse alegado ni existir indicios de pasión, prejuicio o parcialidad de parte de dicho foro,[54] surge que los esfuerzos promocionales realizados por Jarra para vender los productos de Axxis fueron mínimos, llegando al punto de abandonar su promoción durante los años 1994 y 1995. No se reclutó nuevo personal para encargarse de las ventas, y la publicidad se limitó a algunos anuncios en los periódicos. Tratándose de un producto nuevo y costoso, los esfuerzos de mercadeo debieron ser agresivos, acción que Jarra no realizó. Según la prueba desfilada, otros distribuidores en los Estados Unidos lograron vender el producto durante ese período de tiempo. Concluimos que Jarra está obligada a pagar la cantidad adeudada a Axxis, ante el incumplimiento de la condición suspensiva por razones atribuibles a su desidia, falta de buena fe y de desplegar un esfuerzo razonable para viabilizar la ocurrencia del referido evento futuro e incierto.

## III

Nos resta determinar si Jarra actuó de manera temeraria en la litigación de este caso y si procede la imposición de honorarios de abogado por temeridad. La Regla 44.1 (d) de Procedimiento Civil[55] dispone lo siguiente:

> (d) *Honorarios de abogado.-* En caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta.

La temeridad no está definida en la regla antes citada, pero hemos expresado que "la temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia".[56] De igual manera, hemos expresado que la imposición de

---

[54] <u>Trinidad v. Chade</u>, res. el 18 de enero de 2001, 2001 T.S.P.R. 7, 153 D.P.R. ____ (2001), 2001 J.T.S. 10; <u>Rolón v. Charlie Car Rental, Inc.</u>, res. el 2 de junio de 1999, 99 T.S.P.R. 83, 148 D.P.R. ____ (1999), 99 J.T.S. 89; <u>Oliveras, Inc. v. Universal Ins. Co.</u>, <u>supra</u>.

[55] 32 L.P.R.A. Ap. III, R. 44.1 (d).

honorarios de abogado por temeridad persigue castigar aquellos litigantes que obligan a otras personas a incurrir en gastos innecesarios al interponer pleitos frívolos, o alargar innecesariamente aquellos ya radicados.[57] La imposición de honorarios por temeridad descansa en la discreción del Tribunal.[58] Sin embargo, en aquellos casos en que los tribunales inferiores abusen de su discreción, esta Curia podrá revisar su actuación.[59]

En Roberco, Inc. y Colón v. Oxford Inds., Inc., supra, expresamos que una de las obligaciones del distribuidor, bajo un contrato de distribución, es hacer esfuerzos razonables y de buena fe para crear un mercado favorable para el producto de su principal. Bajo las circunstancias particulares de este caso, la presentación de una demanda ante el Tribunal de Primera Instancia por Jarra, bajo ese estatuto, constituyó una actuación temeraria y tiene como consecuencia la sanción judicial. Veamos.

Jarra entabló una demanda contra Axxis por cancelarle sin justa causa su contrato de distribución. No obstante, de la prueba desfilada, y creída por el foro de primera instancia, no surge que Jarra haya creado una clientela ni que haya desplegado un esfuerzo razonable y de buena fe para la promoción de los productos, encaminado a crear un mercado para los mismos. Todo ello, a pesar de que el contrato de distribución entre las partes estuvo vigente desde el mes de agosto de 1992 hasta el mes de agosto de 1995. El Tribunal de Primera Instancia determinó que los daños alegados en realidad constituían gastos fijos, en los cuales Jarra hubiera incurrido de cualquier manera, y que no estaban relacionados con el contrato de distribución. Con su acción, Jarra provocó que Axxis se viera forzada a litigar este caso. Tal actuación de Jarra interfirió con la maquinaria de la administración de la justicia y le causó molestias y gastos innecesarios a Axxis. Procede la imposición a Jarra de honorarios de abogado por temeridad.

---

[56] Oliveras, Inc. v. Universal Ins. Co., supra; Elba A.B.M. v. U.P.R., 125 D.P.R. 294 (1990); Fernández v. San Juan Cement Co., Inc., 118 D.P.R. 713 (1987).

[57] Íd.

[58] Elba A.B.M. v. U.P.R., supra.

[59] Íd.

IV

Por los fundamentos antes expuestos, procede revocar la sentencia dictada por el Tribunal de Circuito de Apelaciones y confirmar aquella dictada por el Tribunal de Primera Instancia.  Además, procede condenar a Jarra al pago de la suma de cinco mil dólares ($5,000) a Axxis en concepto de honorarios de abogado por temeridad.

Se dictará sentencia de conformidad.


Efraín E. Rivera Pérez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Jarra Corporation

    Recurrida

       v.

Axxis Corporation                                      Certiorari
                              CC-2000-318

    Peticionaria


EN EL TRIBUNAL SUPREMO DE PUERTO RICO

SENTENCIA

San Juan, Puerto Rico, a 30 de noviembre de 2001.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta sentencia revocando la emitida por el Tribunal de Circuito de Apelaciones y se confirma aquella dictada por el Tribunal de Primera Instancia. Se condena a Jarra al pago de la suma de cinco mil dólares ($5,000) a Axxis en concepto de honorarios de abogado por temeridad.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Naveira de Rodón concurre sin opinión escrita. El Juez Asociado señor Fuster Berlingeri disiente sin opinión escrita.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo