# 2008 DTA 92

## TRIBUNAL DE APELACIONES
## REGIÓN JUDICIAL CAGUAS

VIVALDI & ASSOCIATES, INC.
Demandante-Apelante

v.

ESMO CORP.
Demandado-Apelante

v.

ROBERTO L. REXACH CINTRÓN POR SI Y EN SU CARÁCTER PERSONAL Y COMO REPRESENTANTE DE LA SOCIEDAD DE GANANCIALES QUE TIENE CON SU ESPOSA MARÍA CABAÑAS Y HNC ROBERTO L. REXACH CINTRÓN & ASOCIADOS
Demandado Contra Tercero-Apelado

Núm. KLAN-2008-00257

San Juan, Puerto Rico, a 11 de julio de 2008

Panel integrado por su Presidenta, la Juez Pesante Martínez,
el Juez Escribano Medina y la Juez Hernández Torres

Escribano Medina, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece la parte apelante, ESMO Corporation (ESMO), y solicita la revocación de una sentencia dictada por el Tribunal de Primera Instancia, Sala de Caguas, (Hon Ayxa Rey Díaz, J.), el 11 de septiembre de 2007, notificada el 13 de diciembre de 2007. En la misma, el Tribunal declaró con lugar la demanda en cobro de dinero instada por el apelado, Vivaldi & Associates, Inc., (Vivaldi) y desestimó la demanda contra Tercero de ESMO contra el apelado, Ing. Roberto Rexach (Rexach), la demanda de Vivaldi contra el Ing. Rexach, y la Reconvención del Ing. Rexach contra Vivaldi.

### I

El apelado, Vivaldi, presentó demanda sobre incumplimiento de contrato y cobro de dinero contra ESMO el 3 de mayo de 2005. Allí se reclamó el pago de las dos últimas certificaciones de pago relacionadas al proyecto de construcción conocido como Construcction of New Facilities, Esmo Hidraulic and Cable Care Service, en la Carretera PR-1, Quebrada Arenas, San Juan, Puerto Rico. Alegaron, además, que ESMO adeudaba la cantidad de $59,493, más intereses, aun cuando habían aceptado la obra y ocupado la misma.

Por su parte, el apelante, ESMO, presentó Contestación a la Demanda y Reconvención el 31 de agosto de 2005. En la misma, ESMO negó las alegaciones presentadas por Vivaldi en la Demanda y le imputó vicios de construcción por lo que reclamó el pago de $69,918.00 en concepto de costos de reparación, en los que tuvo que incurrir para reparar los vicios alegados.

El 9 de noviembre de 2005, Vivaldi presentó su Réplica a la Reconvención. En síntesis, negó las alegaciones de la Reconvención y alegó afirmativamente que la construcción se había realizado conforme a las especificaciones y los planos preparados por el Ing. Rexach. Además, alegó que de haber alguna deficiencia en el proyecto, la misma era imputable a defectos de diseño y/o problemas relacionados con un movimiento de tierra previo a la construcción realizado por ESMO y/o por otros factores.

El 12 de enero de 2006, ESMO presentó Demanda Contra Tercero, contra el Ing. Rexach, ya que la construcción había sido realizada conforme a los planos y especificaciones del Ing. Rexach. ESMO alegó que el Ing. Rexach debía ser responsable por todo o parte de lo que en su día ESMO tuviera que pagarle a Vivaldi como resultado del pleito de cobro de dinero.

El 18 de julio de 2007, el Ing. Rexach presentó Contestaciones a Demanda y Reconvención. En la misma negó las alegaciones de la Demanda y arguyó que Vivaldi era responsable por no haber supervisado a los sub-contratistas que utilizó para construir la obra. Vivaldi negó dichas alegaciones.

Celebrado el juicio, el Tribunal concluyó las siguientes determinaciones de hechos, las cuales hacemos parte de este escrito por entender que las mismas se encuentran sustentadas por la prueba:

*"El 2 de febrero de 1998, el Ing. Rexach le presentó una propuesta de servicios profesionales a ESMO para el diseño del proyecto de Oficinas y Talleres ESMO, ubicado en la carretera #1 Km. 24.3, Barrio Quebrada Arenas, San Juan P.R. Dicha propuesta fue aceptada por ESMO el 12 de febrero de 1998. Como parte de la propuesta aceptada, el Ing. Rexach tendría la responsabilidad, entre otras cosas, de revisar los desgloses de pagos y recomendar el pago de las certificaciones periódicas del contratista. El Ing. Rexach fungía como Inspector Designado de ESMO ante ARPE."*

Como parte de los preparativos previos al inicio del proyecto, el Ing. Rexach solicitó a la empresa GEOTEC que realizara un estudio de suelo en el lugar a construirse el proyecto. Dicho estudio fue presentado a ESMO el día 22 de julio de 1998. El proyecto tuvo oposición del Municipio de San Juan por alegaciones de contaminación al ambiente y no se le otorgaron los permisos correspondientes para comenzar la construcción.

El Sr. Lebrón contrató los servicios del Sr. Ismael Sánchez para que éste realizara movimientos de tierra en el lugar del proyecto, para preparar el terreno para la construcción y tener acceso a otro solar de su propiedad colindante por la pendiente de éste.

Dicho movimiento de tierra se hizo sin la intervención, ni la recomendación del Ing. Rexach, ni de Vivaldi, sino que se contrató directamente entre ESMO y el Sr. Ismael Sánchez. El movimiento de tierra se completó para el 24 de mayo de 2000. Esto es, antes de que Vivaldi comenzara a trabajar en las obras del proyecto. Luego del movimiento de tierra realizado por el Sr. Ismael Sánchez, contratista de ESMO, no se realizó estudio de suelo alguno para determinar qué efecto, si alguno, había tenido el movimiento de tierra sobre las características del terreno.

El 21 de marzo de 2001, Vivaldi, envió al Sr. Víctor Esteves, representante de ESMO, su propuesta-cotización, por la cantidad de $396,885.00, para el proyecto de ESMO identificado como *"Hydraulic and Cable Crane Services"*. La misma expresamente disponía que no estaba incluido el movimiento ni la preparación o compactación del terreno, ya que sería el dueño quien se encargaría de contratar con la persona que se ocuparía de

esas funciones.

El 20 de mayo de 2002, Vivaldi, ESMO y el Ing, Rexach se reunieron en la oficina de este último y suscribieron un contrato de arrendamiento de obras por el precio alzado de $396,885.00. El mencionado contrato fue preparado en su totalidad por el Ing. Rexach en sus oficinas. Mediante dicho contrato, Vivaldi se obligaba a construir ciertas facilidades para taller y oficinas de ESMO, conforme a los planos y especificaciones diseñados por la firma de ingenieros Rexach Cintrón & Asociados desde el 1998. De otra parte, ESMO se obligaba a pagar el precio convenido.

El movimiento de tierra realizado por el Sr. Ismael Sánchez a instancias de ESMO, previo a Vivaldi iniciar sus trabajos, resultó incompatible con el diseño original del Ing. Rexach por lo que hubo que hacer otra mensura y otro diseño. Tuvo que eliminarse una nave que se iba a utilizar para reparar maquinaria. Se adaptó el diseño a las condiciones del solar que se transformaron con el movimiento de tierra. Se preparó y aplanó una parte del solar para que sirviera de rampa para trasladar el equipo pesado de los talleres por el centro del solar al estacionamiento al solar colindante. Se preparó un cambio de orden y una reducción en el precio del contrato de $31,885.00. Según ajustado, el precio pactado fue por un total de $365,000.00.

A pesar de que el Artículo 6 del contrato de construcción disponía que Vivaldi *"... shall supervise and coordinate the earth movement"*, en realidad Vivaldi nunca acordó, cotizó o facturó por dichas labores, pues la intención de las parte no era que Vivaldi se encargara del movimiento de tierra, sino de la agrimensura. Es decir, Vivaldi fue responsable de marcar los puntos para el corte y el relleno del solar para la construcción de los talleres, oficina y estacionamiento, pero no del movimiento y compactación de la tierra. El movimiento de tierra se realizó antes de la firma del contrato de construcción. Para llevar a cabo los trabajos de agrimensura antes descritos, Vivaldi contrató los servicios del agrimensor Raúl Homs.

La totalidad de la obra se facturó mediante 8 Certificaciones. Las certificaciones #1 a #6 fueron aprobadas por el Inspector designado por el dueño, el tercero demandado Rexach y pagadas por ESMO a Vivaldi. La certificación #7 ascendente a $29,380.50 fue aprobada por el Ing. Rexach, el día 7 de julio de 2003, sin embargo, la misma no fue pagada por ESMO. El Ing. Rexach hizo la siguiente anotación a manuscrito en la Certificación: *"Se acepta esta certificación. Sin embargo, tal aceptación no implica que puedan haber deficiencias menores que tienen que ser corregidas por el Contratista Vivaldi & Associates, Inc. antes de la aceptación y pago final del proyecto. Aceptado, Vivaldi & Associates, Inc."* Luego de la aceptación de la Certificación Núm. 7, por Ing. Rexach, Vivaldi corrigió ciertos defectos menores que le fueran señalados por ESMO y/o su inspector. La entrega sustancial del proyecto se consumó.

La Certificación #7 configuraba el 100% de ejecución del contrato. Luego de que el Ing. Rexach inspeccionara la obra y confirmara que se habían corregido los defectos menores previamente señalados de la certificación #7, el Ing. Rexach aprobó, el día 4 de septiembre de 2003, la Certificación Final #8, ascendente a $30,112.50. Sin embargo, la misma tampoco fue pagada por ESMO.

Según sus propias admisiones, ESMO ocupó la obra construida a toda capacidad y la ha estado utilizando a toda capacidad hasta el día de hoy para sus operaciones diarias desde septiembre de 2003.

El 22 de septiembre 2003, el Ing. Rexach, en representación de ESMO ante ARPE, certificó que la obra había sido inspeccionada por él y que la misma se había construido conforme a los planos aprobados. Obtuvo el Premiso de Uso expedido por ARPE. Entre octubre y diciembre de 2003, Vivaldi hizo gestiones para que ESMO pagara las certificaciones pendientes. No obstante, ESMO se negó a pagar.

El 12 de diciembre de 2003, luego de varias gestiones de Vivaldi por cobrar el balance adeudado, el Sr. Víctor Esteves, representante de ESMO, le notificó por carta al Ing. Rexach y al Sr. Vivaldi de una reunión a

celebrarse el 19 de diciembre de 2003 en las facilidades del proyecto, para inspeccionar las condiciones que presentaba el piso del taller y del estacionamiento, ya que ambos, alegadamente, tenían deficiencias.

Las alegadas deficiencias en el proyecto señaladas por ESMO eran: (1) grietas y declives inadecuados en la losa del piso del taller; (2) anclaje deficiente de la cubierta del techo: (3) pavimento deficiente en el estacionamiento, y (4) falta de protección contra la oxidación en la estructura de acero. La reunión fue citada originalmente para el 19 de diciembre de 2003; sin embargo, se realizó el 18 de diciembre de 2003. A la reunión asistieron el Ing. Rexach, el señor Luis Vivaldi y los señores Víctor Estévez Rivera y Víctor Estévez Borrero, en representación del demandado ESMO.

Durante la reunión, los señores Estévez le mostraron a Vivaldi y Rexach ciertas grietas y declives en la losa del piso del taller. Señalaron que el anclaje de la cubierta del techo del taller era deficiente. Igualmente señalaron que el asfalto o pavimento del estacionamiento era deficiente y reflejaba ondulaciones al paso de equipo pesado. También se quejaron de la alegada falta de protección contra la oxidación en los componentes de la estructura de acero.

El Ing. Rexach sugirió hacer otro estudio de suelo para determinar las causas de tal comportamiento del asfalto en el estacionamiento y tomar una decisión mejor informada sobre las posibles maneras de resolver el asunto. Para esa fecha, el asfalto se había hundido formando crestas. Vivaldi, por su parte, se comprometió a obtener un estimado del costo de reemplazar el asfalto y ESMO a obtener un estimado del costo de remover el asfalto existente. Vivaldi estuvo dispuesto a corregir las pequeñas grietas del piso del taller y los declives. A tono con lo acordado en la reunión del 18 de diciembre de 203, el Ing. Rexach obtuvo una cotización y recomendó a ESMO que se hiciera otro estudio de suelo para identificar las causas del comportamiento en el pavimento del estacionamiento. Sin embargo, ESMO en ningún momento se comunicó con Vivaldi o Rexach.

En vista de la negativa de ESMO a realizar el estudio de suelo, Vivaldi ofreció una alternativa. A esos efectos, el 17 de junio de 2004, cursó otra comunicación al Sr. Víctor Estévez reiterándole su disposición para culminar los trabajos de reparación necesarios y recibir el balance adeudado. Acompañó dicha comunicación con una propuesta preparada por el Ing. Guerra de la empresa Better Roads.

Según fuera admitido por el señor Estévez Borrero durante su testimonio, ESMO rechazó de plano hacer un estudio de suelo o que se corrigiera el estacionamiento; sin embargo, nunca le comunicó a Rexach, o a Vivaldi que había rechazado de plano sus sugerencias para atender las deficiencias reclamadas. Para el 10 de junio de 2004, ESMO removió el asfalto y colocó la mogolla en el estacionamiento, en detrimento del derecho de Vivaldi de reparar los defectos señalados y cobrar el balance adeudado.

A pesar de los múltiples intentos de Vivaldi por reparar las deficiencias señaladas, ESMO le impidió el acceso al proyecto.

De la prueba desfilada en el juicio surgió que:

*"a) Para el 18 de diciembre de 2003, ya ESMO y/o sus principales conocían de las deficiencias que eran aparentes en el proyecto. Se discutieron en la referida reunión. ESMO y/o sus principales se cruzaron de brazos luego de su reclamo inicial y en efecto impidieron que tanto Vivaldi, como Rexach trabajaran en la búsqueda de una solución económica y técnicamente viable para corregirlas. No es sino hasta el 31 de agosto de 2005, luego de presentada la Demanda, que ESMO alegó en su Reconvención, "vicios" que había originalmente señalado en la reunión de diciembre de 2003 y que luego de haberse discutido maneras de corregir las deficiencias, no se comunicó con el contratista o ingeniero.*

*b) ESMO removió material del proyecto, se negó a realizar un estudio de suelo e impidió que se corrigieran las*

*alegadas deficiencias con la clara intención de no pagar las certificaciones pendientes de pago en un proyecto que se había sustancialmente completado y que se estaba ocupando con el permiso de uso correspondiente y utilizado ininterrumpidamente desde septiembre 2003."*

ESMO no demostró ni presentó prueba sobre cuál fue la causa de los alegados vicios alegados en la Demanda. Tampoco pudo demostrar cuál, si alguno, fue el defecto de diseño. El perito de Vivaldi, el Ing. Orban Mendoza declaró que la estructura de acero estaba bien anclada y que la oxidación a la fecha de los Informes (2007) se debió al transcurso del tiempo desde el 2003.

Dispuso el Tribunal que en el caso de autos el contratista no sería responsable por los vicios de construcción, si alguno, pues los mismos, de haber existido, eran manifiestos. Además, expresó que aunque está establecido que un contratista responde por los vicios aparentes que se haya comprometido reparar, en este caso no le fue permitido por el demandado, a pesar de su disposición.

Finalmente, el Tribunal declaró Ha Lugar la Demanda presentada por los apelados, Vivaldi & Associates contra ESMO Corp., y le ordenó a este último el pago de $59,493, más el interés legal correspondiente de 9.25%, a ser computado desde la fecha en que surgió la causa de acción, es decir, septiembre de 2003, así como el pago de honorarios de abogado, costas y gastos del pleito. Además, desestimó la demanda contra Tercero de ESMO contra el Ing. Rexach, la demanda de Vivaldi contra el Ing. Rexach, y la Reconvención del Ing. Rexach contra Vivaldi.

Inconforme, la parte apelante, ESMO Corp., acudió ante nos y señaló la comisión de los siguientes errores por el Tribunal de Primera Instancia:

*"1. Erró el TPI, como cuestión de hecho y de derecho, al determinar que el apelado había realizado el trabajo pactado y por ende el apelante estaba obligado al pago en su totalidad por los servicios prestados.*

*2. Erró el TPI, como cuestión de hecho y de derecho, al eximir de responsabilidad al tercero-demandado, Ingeniero Rexach, cuando éste, siendo el diseñador, inspector y supervisor de la obra, fue negligente en sus funciones e incumplió su responsabilidad contractual hacia ESMO Corp. y es responsable solidariamente por las deficiencias encontradas en la obra pactada y realizada por el apelado.*

*3. Erró el TPI, como cuestión de hecho y de derecho, en la apreciación de la prueba oral al darle entera credibilidad a la parte apelada, sin otorgar ningún tipo de credibilidad a la parte apelante.*

*4. Erró el TPI al invertir el peso de la prueba y por ende el imponer la obligación primera de presentar evidencia a la Parte Apelante en clara violación a la Regla 10 (B) de las Reglas de Evidencia de Puerto Rico.*

*5. Erró el TPI al concluir, como cuestión de hecho y derecho, que la Parte Apelante actuó con temeridad e imponer el pago de una suma por concepto de honorarios de abogado."*

## II
### Apreciación de la prueba

Como punto de origen, es importante recalcar la doctrina ampliamente reconocida en nuestro ordenamiento jurídico procesal consistente en que los tribunales apelativos debemos mantener la norma de deferencia judicial en cuanto a la apreciación de la prueba oral a que sometió el juzgador primario la prueba desfilada. El fundamento de esta deferencia hacia el foro apelado es que el juez del foro recurrido tuvo la oportunidad de observar toda la prueba presentada y, por lo tanto, se encuentra en mejor situación que el tribunal apelativo para considerarla. Reiteró el Tribunal Supremo en *Dr. Serrano Muñoz v. Hospital Auxilio Mutuo,* 171 D.P.R. ___ (2007),

**2007 J.T.S. 139**, que como regla general, un tribunal apelativo no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que haya efectuado el juzgador de los hechos, ni tiene facultad de sustituir por sus propias apreciaciones, las determinaciones del foro de instancia. *Rolón v. Charlie Car Rental,* 148 D.P.R. 420 (1999). No obstante, ha expresado el Tribunal que la normativa antes expuesta **no** es absoluta. Ésta cede si puede establecerse que en las determinaciones del Tribunal de Primera Instancia medió pasión, prejuicio, parcialidad o error manifiesto. *Álvarez de Choudens v. Rivera Vázquez,* 165 D.P.R. __ (2005); **2005 J.T.S. 90**.

Así, este foro apelativo no intervendrá con las sentencias u órdenes apeladas a menos que un análisis sereno y desapasionado de la prueba nos convenza que las determinaciones de hechos formuladas por el tribunal de instancia no representan el balance más racional, justiciero y jurídico de la totalidad de la evidencia que desfilara ante él. *Sánchez Rodríguez v. López Jiménez,* 116 D.P.R. 172 (1985).

## Doctrina de *exceptio non rite adimpleti contractu*

Sabido es que a partir del perfeccionamiento de un contrato, las partes quedan obligadas al cumplimiento de lo expresamente pactado y a las consecuencias que se deriven del mismo, ello conforme a la buena fe, al uso y a la ley. Art. 1210 del Código Civil de P.R., 31 L.P.R.A sec. 3375.

Cuando una de las partes ha cumplido su obligación de forma *"parcial o defectuosamente sin ajustarse debidamente a lo que exige el vínculo obligatorio"*, nuestro ordenamiento aplica a la situación la doctrina de la *exceptio non rite adimpleti contractu*. Esta doctrina sirve como defensa para el demandado que está en disposición de cumplir su obligación, pero reclama el incumplimiento defectuoso de la parte demandante como argumento para explicar su propia situación irregular ante el contrato. Al respecto, el Tribunal Supremo expresó en *Álvarez de Choudens v. Rivera Vázquez, supra*:

*"[L]a defensa de exceptio non rite adimpleti contractus puede ser invocada por el demandado en los casos en que el demandante pretende exigir el cumplimiento de una obligación a pesar de que él ha cumplido parcial o defectuosamente con su prestación, y su efecto será que el demandado no vendrá obligado a cumplir con su parte hasta tanto el demandante cumpla con la suya. No obstante, en los casos en que la aplicación de la exceptio non rite adimpleti contractu pueda resultar contraria al principio de la buena fe contractual, el demandado no podrá invocar la excepción exitosamente. En esos casos procede reducir el importe de lo no realizado o en atención a lo llevado a cabo defectuosamente."* (Énfasis omitido.)

Cuando la obligación se ha cumplido de forma parcial o defectuosa, *"será procedente exigir el cumplimiento total o libre de defectos y, en los casos en que proceda, una reducción proporcional del precio"*. No obstante, la aplicación exitosa de la doctrina presupone que el demandado está en disposición de cumplir su obligación principal y que aún pueda efectivamente cumplirla, a tenor de los términos del contrato. Ahí se sostiene el escrutinio de la buena fe contractual. Carente la parte demandada o reconvenida de ese estado, porque no cumplió debidamente su obligación principal, no tiene disponible la defensa a su favor. *Álvarez de Choudens v. Rivera Vázquez, supra.*

## Orden de la prueba

Por otro lado, la Regla 43(C) de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 43(C), dispone que el juez que preside un juicio o vista tendrá control y amplia discreción sobre el modo en que la evidencia es presentada y los testigos son interrogados con miras a que la evidencia sea presentada en la forma más efectiva posible para el esclarecimiento de la verdad, velando por la mayor rapidez de los procedimientos y evitando dilaciones innecesarias. En este sentido, el Tribunal Supremo ha señalado que normalmente el juez de instancia goza de una amplia discreción para alterar el orden de la presentación de la prueba. *Pueblo v. Ríos,* 114 D.P.R. 256 (1983). Por

tal razón, señaló el Tribunal:

*"Un cambio en el orden de la prueba, excepto cuando prive en forma claramente perjudicial de un derecho legal o constitucional específico al acusado, no es razón para revocar. Aun cuando se trate de hechos no relacionados, que normalmente deben traerse en la etapa de refutación, los tribunales tienen facultad discrecional para alterar el orden de la prueba, si no se cae en el vicio antes señalado."*

## Honorarios de abogado

La imposición de honorarios de abogado por temeridad está regulada por el inciso (d) de la Regla 44.1 de las de Procedimiento Civil de Puerto Rico, 32 L.P.R.A. Ap. III. R. 44.1 (d). El texto de dicha regla, en su parte pertinente, es el siguiente: *"En caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable, el pago de una suma por concepto de honorarios de abogado que el tribunal entienda corresponda a tal conducta."*

Según lo anterior, un tribunal deberá imponer una suma por concepto de honorarios de abogado a una parte que por sí o mediante su representación legal haya actuado con temeridad o frivolidad. No obstante, la conclusión de temeridad no tiene que ser explícita, ya que cuando el Tribunal de Primera Instancia impone honorarios de abogado en su dictamen se presume que dicha conclusión está implícita en la sentencia. Sin embargo, una vez determinada la temeridad, su imposición es mandatoria. *Fernández v. San Juan Cement Co., Inc.,* 118 D.P.R. 713 (1987).

La conducta que amerita la imposición de honorarios de abogado es cualquiera que haga necesario un pleito que se pudo evitar, o que produzca la necesidad de que la otra parte incurra en gestiones evitables. *Ramírez v. Club Cala de Palmas,* 123 D.P.R. 339 (1989).

Al tenor de la Regla 44.1(d) de Procedimiento Civil, *supra*, la imposición de honorarios de abogado y su cuantía es enteramente discrecional del juez de instancia. *Revlon v. Las Américas Trust Co.,* 135 D.P.R. 363 (1994). Así pues, la determinación de si una parte ha actuado o no con temeridad descansa en la sana discreción del tribunal.

Desde luego, en aquellos casos en que los tribunales inferiores abusen de su discreción, los tribunales apelativos pueden revisar su actuación. *Jarra Corporation v. Axxis Corporation,* 155 D.P.R. 764 (2001). Por tanto, los tribunales revisores intervendrán cuando surja de tal actuación un claro abuso de discreción. Es decir, una partida de honorarios de abogado concedida por un Tribunal de Primera Instancia no se variará en apelación a menos que la misma sea excesiva, exigua o constituya un abuso de discreción. *Ramírez Anglada v. Club Cala de Palmas, supra.*

## III

En su primer y tercer señalamiento, arguyó el apelante que erró el TPI al determinar que el apelado, Vivaldi, había realizado el trabajo pactado, por lo que ESMO estaba obligado a pagar la totalidad de la obra y al darle entera credibilidad a la parte apelada.

Guiados por la norma claramente establecida por el Tribunal Supremo de Puerto Rico que dispone que en ausencia de error manifiesto, pasión, prejuicio o parcialidad, no se intervendrá a nivel apelativo con la adjudicación de credibilidad hecha por el juzgador de los hechos, debemos colegir lo siguiente.

Según surge del expediente ante nos, existen ocho certificaciones suscritas por el Ingeniero Roberto Rexach, inspector de la obra y agente de ESMO ante ARPE, que certifican que la obra fue realizada en su totalidad y recomiendan al apelante el pago total de la misma. Surge, además, del testimonio del señor Estévez,

dueño de ESMO, que comenzó a operar en las nuevas instalaciones para octubre de 2003. Lo anterior, junto con el permiso de uso de ARPE y la demás prueba desfilada, nos mueve a concluir, así como determinó el foro de instancia, que el trabajo para el cual ESMO contrató a Vivaldi fue, en efecto, sustancialmente completado.

No obstante, aunque se desprende de la prueba desfilada que para diciembre de 2003, luego de entregada la obra, hubo entre las partes discusión sobre unos alegados defectos y algunos acuerdos para la reparación, lo cierto es que también surge de los testimonios vertidos que el apelante, ESMO, no volvió a comunicarse con el apelado, Vivaldi, y comenzó a reparar los alegados defectos sin responder además a las comunicaciones de este último. Cabe añadir que según el testimonio del Ing. Rexach, y creído por el Tribunal, ESMO impidió que tanto Vivaldi como Rexach trabajaran en la búsqueda de una solución económica y técnicamente viable para corregirlas.

Como arriba esbozado, la doctrina *exceptio non rite adimpleti contractu* invocada por ESMO en este caso, ante el alegado cumplimiento defectuoso del contrato, tendría el efecto de la disminución proporcional del precio en razón de las deformidades o vicios, una vez determinado que la obra fue sustancialmente completada.

En el caso ante nos, sin embargo, la parte apelante no le permitió a Vivaldi que regresara al proyecto, por lo que no le dio oportunidad de corregir los defectos que pudieran existir. Lo anterior denota la ausencia de buena fe por quien pretende invocar la doctrina mencionada. El ordenamiento es claro al disponer que no puede beneficiarse de la defensa de incumplimiento parcial de la obligación quien no actúa de buena fe. Toda vez que la obra fue completada sustancialmente y que ESMO impidió la corrección de los alegados defectos, procede el pago total de la obra por el apelante, sin descuento alguno. No surgen del expediente razones para alterar la credibilidad otorgada por el Tribunal a los testimonios vertidos, por lo que los errores antes señalados, no fueron cometidos.

En su segundo señalamiento, arguyó el apelante que erró el Tribunal al eximir de responsabilidad al ingeniero Rexach por las deficiencias encontradas, ya que siendo éste el diseñador, inspector y supervisor de la obra, fue negligente en sus funciones.

Como antes esbozado, surge de los testimonios vertidos y creídos por el Tribunal que el Ing. Rexach, allá para diciembre de 2003, luego de haber realizado las labores de diseño e inspección para las que fue contratado y obtener los permisos de uso de ARPE, estuvo presente en la mencionada reunión convocada por ESMO en la cual se discutieron los alegados defectos en la obra. Declaró el Ing. Rexach que en vista de que no se conocía la causa para el comportamiento del piso del estacionamiento (el cual alegadamente estaba defectuoso), éste recomendó a ESMO realizar un estudio de suelo antes de hacer cualquier reparación, para lo cual consiguió una cotización. ESMO, por su parte, decidió hacer caso omiso a dicha recomendación y comenzó a reparar conforme lo entendió viable. Los peritos en el caso testificaron que al momento de hacer sus inspecciones en el caso, el piso del estacionamiento del cual se alegaron defectos, había sido removido y estaba siendo reparado, por lo que no pudieron establecer que en efecto existía un defecto o las causas del mismo. Para los demás defectos alegados por la apelante, no existe en el expediente prueba alguna de que se trate de un defecto de diseño, o que fuera producto de una deficiente inspección o supervisión de parte del Ing. Rexach. Tampoco hay prueba alguna de cuánto es el costo de la reparación para estos alegados defectos. Lo que sí surge es la intención del ingeniero Rexach por completar su labor de supervisión y la negativa de los apelantes de seguir las recomendaciones de éste. No erró el Tribunal al eximir de responsabilidad al Ingeniero Rexach.

En su cuarto señalamiento, alegó el apelante que erró el Tribunal al invertir el peso de la prueba y por ende imponer la obligación primera de presentar evidencia a la apelante.

Examinada la transcripción, es forzoso concluir que las actuaciones del juzgador de instancia estuvieron enmarcadas en la amplia discreción que otorga nuestro ordenamiento al juez que preside un juicio sobre el

modo en que la evidencia es presentada y los testigos son interrogados. El orden establecido por el Tribunal de Instancia denotó el fin de velar por la más efectiva presentación de la prueba, en vista de que en el caso ante nos existía una reclamación en cobro de dinero instada por la parte apelada, Vivaldi, y otra por incumplimiento de contrato instada por la apelante. El orden de la prueba, en ninguna forma menoscabó el derecho de las partes. Cada uno de los litigantes tuvo amplia oportunidad de probar su respectiva reclamación y desfilar su prueba, por lo que el cuarto error señalado, no fue cometido.

Finalmente, alegó el apelante que erró el Tribunal al imponer el pago de honorarios de abogado por temeridad.

Al ser la imposición de honorarios de abogado y su cuantía enteramente discrecional del juez de instancia, y en vista de que la determinación de si una parte ha actuado o no con temeridad, descansa en la sana discreción del tribunal, corresponde a la persona que alegue lo contrario presentar evidencia suficiente para derrotar tal presunción, no pudiendo descansar únicamente en meras alegaciones.

La determinación de temeridad del Tribunal en este caso, carece de visos de error, prejuicio o parcialidad y está sustentada por el expediente ante nos, por lo que no intervendremos con la misma.

**IV**

Por todo lo anterior, se confirma la sentencia apelada.

Lo acordó el Tribunal y lo certifica la señora Secretaria.

María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones