Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| DAYNA LEE ALLENDE DE LEÓN Y/O FRANCISCO ALEJANDRO HERNÁNDEZ GIRONA<br><br>Parte Recurrida<br><br>v.<br><br>ALFREDO ROMÁN CORREA; MAPFRE PRAICO INSURANCE COMPANY<br><br>Parte Recurrente | KLRA202300273 | *Revisión de Decisión Administrativa* procedente del Departamento de Asuntos del Consumidor<br><br>Querella núm.: SAN-2019-0004407<br><br>Sobre: Ley Núm. 5 de 23 de abril de 1973 Construcción |

Panel integrado por su presidenta, la Juez Grana Martínez, el Juez Rodríguez Flores y el Juez Salgado Schwarz.[1]

Rodríguez Flores, juez ponente.

## SENTENCIA

En San Juan, Puerto Rico, a 11 de marzo de 2024.

El Sr. Alfredo Román Correa (Sr. Román Correa o recurrente) solicita que revoquemos la *Resolución* emitida el 10 de abril de 2023, notificada en igual fecha, por el Departamento de Asuntos del Consumidor (DACO o agencia recurrida). Mediante el referido dictamen, DACO declaró con lugar la reclamación instada por la Sra. Dayna Lee Allende de León y el Sr. Francisco Alejandro Hernández Girona (en adelante esposos Hernández Allende o recurridos) y ordenó al Sr. Román Correa pagarle a los recurridos varias sumas.[2]

Tras examinar los escritos de las partes comparecientes, así como los documentos que conforman el apéndice, y tomando en

---

[1] Véase, OATA-2024-033, en la que se designa al juez Salgado Schwarz en sustitución del juez Figueroa Cabán.

[2] DACO ordenó al Sr. Román Correa pagarle a los recurridos las siguientes sumas: $6,047.50 por incumplir con su obligación de realizar una obra satisfactoria, $1,000.00 por concepto de daños y angustias mentales y $ 2,000.00 por concepto de honorarios de abogado. En su dictamen, DACO ordenó a MAPFRE PRAICO Insurance Company, fiadora del Sr. Román Correa, responder de forma subsidiaria por las sumas impuestas hasta cubrir el monto de la fianza de $4,000.00.

consideración el extenso trasfondo fáctico y procesal del caso, se modifica la resolución recurrida y así modificada, se confirma.

**I.**

**A.**

Los esposos Hernández Allende otorgaron Escritura de Compraventa y Designación de Hogar Seguro[3], mediante la cual adquirieron una propiedad reposeída a través de un préstamo FHA 203k. Dicho préstamo, realizado a través de Home Mortgage Bank (en adelante Banco), permite financiar la compra y efectuar las reparaciones necesarias a la propiedad con una sola hipoteca. En la escritura, los esposos Hernández Allende acordaron que la compra de la propiedad se realizaba en el estado y condición actual de esta *(as is, where is)*. La propiedad, ubicada en el Municipio de Toa Alta, estuvo abandonada y desocupada por alrededor de dos años. Por ello, la propiedad requería extensas reparaciones para poder ser habitada por los esposos Hernández Allende. Dado a que el matrimonio no logró conseguir contratistas para las reparaciones, estos acudieron al Banco quien le refirió al contratista Sr. Alfredo Román Correa.

Conforme surge de los documentos que obran en el apéndice del recurso, el 26 de noviembre de 2018, el Sr. Román Correa suscribió un documento titulado *Alfredo Román Correa, General Construction Services, Reparación y Remodelación de Propiedad[4]*. En este, surge un desglose con la descripción de los trabajos a realizarse en la propiedad de los esposos Hernández Allende. Los trabajos detallados en la hoja son los siguientes:

| Descripción | Qty | Materiales | Labor | Total |
|---|---|---|---|---|
| Certificación Utilidades (AAA/AEE) | 1 | | 450.00 | 450.00 |

---

[3] Véase, apéndice del recurso, págs. 190-201.
[4] *Íd.*, pág. 182. El documento está firmado únicamente por el Sr. Román Correa.

| Descripción | Qty | Materiales | Labor | Total |
|---|---|---|---|---|
| Lavado y sellado de techo de residencia (sellador elastomérico) | 1 | 1,500.00 | 1,500.00 | 3,000.00 |
| [A]condicionamiento sistema el[é]ctrico, panel, outlets, switch, rosetas | 1 | 650.00 | 1,850.00 | 2,500.00 |
| [A]condicionamiento de rejas exteriores, remoción de ventana | 1 | 700.00 | 250.00 | 950.00 |
| Acondicionamiento de piscina | 1 | 1,750.00 | 1,250.00 | 3,000.00 |
| Instalación de Calentador de l[í]nea (220 V) | 1 | 280.00 | 125.00 | 405.00 |
| Detectores de Humo (5) | 1 | 100.00 | 100.00 | 200.00 |
| Lavamano en el (1/2) baño | 1 | 100.00 | 100.00 | 200.00 |
| Pintura interior/exterior | 1 | 1,000.00 | 1,000.00 | 2,000.00 |
| Instalación de Gabinetes (PVC) en cocina | 1 | 2,800.00 | 2,200.00 | 5,000.00 |
| Remoción de Terraza en madera, Limpieza, recogido de escombros | 1 | 250.00 | 140.00 | 390.00 |
| **Total** | | | | **18,095.00** |

En la parte inferior, el documento lee como sigue:

*Esperamos, servir y realizar* el trabajo con la excelencia y orgullo que solamente Román & Associates le ofrece a sus clientes. Costo total del proyecto a ser realizado será de $18,095.00. *El mismo debe culminar en o antes de (30) días naturales. Los cuales se facturar[á]n con un anticipo del 50% del precio total y el restante al culminar e inspecci[ó]n de la obra.* Todo trabajo anterior será realizado a las especificaciones e instrucciones de los propietarios. *Cualquier alteración o desviación de las especificaciones arriba mencionadas, incluyendo vicios ocultos serán ejecutadas solamente por órdenes escritas comunicadas y vendrá a ser un cargo adicional al estimado original.* (Énfasis nuestro)[5]

El término de treinta (30) días establecido en el documento respondía a la necesidad del matrimonio de ocupar la vivienda, pues tenían que desocupar el apartamento alquilado en el que residían.

---

[5] Según surge de las alegaciones del recurso, el recurrente entregó el documento para la firma de los esposos Hernández Allende. No obstante, no surge del expediente ni del apéndice que dicho documento haya sido firmado ni la fecha en que los recurridos alegadamente firmaron el mismo.

El 15 de diciembre de 2018, los esposos Hernández Allende pagaron al Sr. Román Correa la cantidad de $9,047.50, suma equivalente al anticipo del 50% del pago total requerido. De dicha suma, el Sr. Román Correa devolvió a los esposos Hernández Allende la cantidad de $3,000.00, correspondiente al costo de la instalación de gabinetes de cocina en PVC, dado que el matrimonio le expresó que un familiar le regalaría los gabinetes. Así, el Sr. Román Correa contaba con un adelanto de $6,047.50 para comenzar los demás trabajos en la propiedad.

El Sr. Román Correa y sus empleados realizaron trabajos en la propiedad desde el 17 de diciembre de 2018 hasta el 28 de diciembre de 2018, para un total de 11 días trabajados. Según expuesto por el recurrente en su recurso, durante ese periodo, se percató de múltiples vicios ocultos que no se notaban a simple vista, pero que requerían reparación para que los trabajos acordados quedaran bien hechos.[6] El Sr. Román Correa notificó sobre los vicios ocultos a los esposos Hernández Allende, quienes rechazaron los señalamientos y alegaron no tener dinero. El Sr. Román Correa expuso que, durante la relación entre las partes—en inicio una de amistad—todos los cambios y modificaciones realizados a los acuerdos se hicieron de forma verbal. El Sr. Román Correa adujo que no realizó extensiones de tiempo o modificaciones por escrito, por entender que los esposos Hernández Allende se negarían a que se realizaran las modificaciones señaladas, así como pagar las mismas. Así, entre las partes surgió una serie de desavenencias que impidieron la culminación de la obra. El 4 de febrero de 2019, el Sr. Román Correa acudió a la propiedad de los recurridos por última vez, para soldar un tubo del techo. Ese día, entre el Sr. Hernández

---

[6] Véase, Recurso de Revisión Administrativa, página 5, acápite 12.

y el Sr. Román Correa surgió una discusión que culminó cuando el Sr. Hernández le pidió al recurrente que se fuera y no volviera.

El 20 de febrero de 2019, los esposos Hernández Allende presentaron por derecho propio una querella ante DACO por incumplimiento y defectos en la obra. En síntesis, alegaron que el Sr. Román Correa dejó trabajos incompletos en la propiedad, que su último día de trabajo fue el 4 de febrero de 2019, y que este requirió más dinero a los recurridos por los trabajos acordados y no terminados. Detallaron una lista de los trabajos incompletos y solicitaron a DACO que revocara la licencia del Sr. Román Correa o se le sancionara.

El 7 de marzo de 2019, el Sr. Román Correa contestó la querella. En síntesis, atribuyó la paralización de las obras a la conducta del Sr. Hernández, lo que impidió que las obras se completaran en el término acordado, además de negarse a pagar dinero adicional por los vicios ocultos señalados. Reclamó que los esposos Hernández Allende le adeudan la suma de $6,547.50, así como $5,000.00 por violación de contrato y difamación a su persona.

El 19 de junio de 2019, el técnico de investigación de DACO, Sr. José Carmona Longo, hizo una inspección de la propiedad. A la inspección compareció el Sr. Román Correa y los esposos Hernández Allende. El informe de inspección fue notificado a las partes el 6 de agosto de 2019.[7] A la luz de los resultados[8] de la inspección, el técnico de investigación recomendó que se celebrara una vista

---

[7] El 10 de agosto de 2019, el Sr. Román Correa presentó sus objeciones al informe. Véase, apéndice del recurso, páginas 97-99.

[8] El informe resume los siguientes hallazgos según alegados en la querella: 1. Certificaciones: Ok.; Reparación y tratamiento de techo: Intervino, pero no ha sido efectivo, continúan las filtraciones; 3. Trabajo completo de electricidad. Realizado parcialmente.; 4. Reparación de rejas en Segundo piso y remoción de Ventana. A. Pésima la reparación realizada. B. la Ventana fue removida.; 5. Acondicionamiento de piscina. Permanece sin el acondicionamiento; 6. Detectores de humo. Mal instalados.; 7. lavamanos en medio baño. OK; 8. Pintura. El trabajo realizado es uno pésimo; 9. Gabinetes de cocina. OK; 10. Remoción de terraza en madera. OK.

administrativa. Notificado el informe, la agencia citó a las partes a una vista administrativa el 17 de octubre de 2019.

Mientras, el 27 de septiembre de 2019, los esposos Hernández Allende enmendaron la querella a los fines de reclamar daños y perjuicios por el incumplimiento del querellado. En síntesis, alegaron que las actuaciones del Sr. Román Correa le causaron daños por el tiempo que la piscina de la propiedad estuvo dañada, por riesgos de enfermedades y contaminación, así como aprehensión por las condiciones de la vivienda y quedar privados del libre uso y disfrute de la propiedad. El 2 de octubre de 2019, DACO notificó la enmienda a las partes.

Llegado el día de la vista administrativa, los esposos Hernández Allende informaron que contrataron una abogada que no podía comparecer. También, que interesaban enmendar nuevamente la querella a los fines de incluir a MAPFRE PRAICO Insurance Company, fiadora del Sr. Román Correa. La vista se convirtió en una sobre el estado de los procedimientos y se les concedió un término a los esposos Hernández Allende para enmendar la querella. Ese mismo día, los recurridos enmendaron la querella para incluir a MAPFRE PRAICO Insurance Company como coquerellada, por ser esta la fiadora del Sr. Román Correa. El 21 de octubre de 2019, DACO notificó la enmienda a las partes. El 12 de noviembre de 2019, el Sr. Román Correa, a través de su representación legal, presentó un escrito en solicitud de término a la agencia y pidiendo una segunda inspección del hogar.[9]

El 15 de noviembre de 2019, los esposos Hernández Allende, esta vez mediante representación legal, presentaron *Querella Enmendada* en la que presentaron más alegaciones. El Sr. Román Correa, presentó *Moción en Solicitud de Remedio*, arguyendo que

---

[9] Véase, apéndice del recurso, págs. 51-52.

ante las numerosas enmiendas de los esposos Hernández Allende, se le dificultaba presentar una contestación adecuada a la querella. Por ello, solicitó a DACO ordenar a los recurridos presentar una querella final completa, en ánimos de poder contestar la querella adecuadamente. Después de varios trámites y enmiendas a la querella, los procedimientos ante DACO fueron detenidos y los términos suspendidos, como consecuencia de la emergencia del COVID-19.

Reanudados los procedimientos y, luego de un breve descubrimiento de prueba, se celebraron varias vistas administrativas. En la vista del 10 de febrero de 2022, testificó la querellante, Sra. Dayna Allende y el Sr. Carmelo Hernández Alvarado, contratista que, a solicitud de los esposos Hernández Allende, realizó una cotización de los trabajos que el Sr. Román Correa no completó. En la vista del 15 de agosto de 2022, continuó el testimonio de la Sra. Allende De León y también testificó el perito electricista de la parte querellante, el Sr. Ricardo Fonseca Serrano. Durante la vista del 22 de agosto de 2022, testificó el querellante, Sr. Francisco Hernández Girona y el testigo Christian Román Lozada, hijo del querellado (Sr. Román Correa).

Luego de la renuncia del juez administrativo que presidía los procedimientos, el caso fue reasignado a otra jueza administrativa y la última vista administrativa se celebró el 20 de diciembre de 2022. En esta se desfiló el testimonio del querellado, Sr. Román Correa. Desfilada la prueba por las partes, el caso quedó sometido para adjudicación. La jueza administrativa, de conformidad con la Regla 26.2 del Reglamento de Procedimientos Adjudicativos de DACO, solicitó a las partes presentar propuestas de determinaciones de hechos, las cuales fueron sometidas por las partes.

Así, de conformidad con la prueba admitida y la totalidad del expediente administrativo, DACO emitió 56 determinaciones de hechos, las cuales se transcriben a continuación:

1. La parte querellante del presente caso se identifica como Dayna Lee Allende De León y Francisco Hernández Girona, casados entre sí y residentes de Toa Alta, en adelante, la parte querellante.

2. La parte querellada Alfredo Román Correa es una persona natural, que se desempeña como contratista, y que está inscrito en el Registro de Contratistas del Departamento de Asuntos del Consumidor, conforme lo exige la Ley 146 del 10 de agosto de 1995. Su licencia de contratista es la Número DACO SJ-7277-CN.

3. La parte coquerellada Mapfre Praico Insurance Company fue la fiadora que prestó la fianza al querellado Alfredo Román Correa, al amparo de la Ley 146 de 1995. El número de la fianza es el 1302148000891, por la cantidad de $4,000.00.

4. Para el mes de noviembre de 2018, la parte querellante se interesó en una propiedad reposeída, ubicada en la Urbanización Montecasino, en la Calle Pino Número 18, en el municipio de Toa Alta. La propiedad tenía 23 años de construcción.

5. Los querellantes decidieron adquirir la residencia mediante un préstamo 203k, que permite financiar la compra y efectuar las reparaciones a la propiedad, asegurando el colateral del préstamo, a través de la institución hipotecaria Home Mortgage Bank.

6. Los querellantes estuvieron buscando sin éxito contratistas que pudieran realizar las reparaciones a la propiedad, por lo que se comunicaron con el banco para informarlo y dos empleados del banco, Sr. Edwin León y Dimarie Aldecoa, le refirieron al contratista querellado, el Sr. Alfredo Román Correa.

7. La parte querellante se comunicó con el contratista querellado Alfredo Román Correa y le explicó que tenían que mudarse a la nueva propiedad para el 1 de enero de 2019, debido a que el dueño del apartamento donde residían, necesitaba rentarlo para esa fecha. A esos efectos, las reparaciones debían realizarse para el mes de diciembre 2018. El querellado estuvo de acuerdo y así quedó establecido en el contrato suscrito entre las partes.

8. **El tasador del banco, la parte querellante y el contratista querellado llevaron a cabo una inspección de la propiedad, para que el tasador hiciera su estimado de reparaciones. El estimado del contratista debía ceñirse a las reparaciones requeridas por el tasador y a los costos de reparación.**

9. El 12 de noviembre de 2018, el banco Home Mortgage Bankers realizó una tasación de la propiedad, la cual refleja las condiciones existentes en la propiedad a ese momento y recomienda las reparaciones que debían realizarse en la misma.

10. El día 26 de noviembre de 2018, la parte querellante y el querellado Alfredo Román suscribieron un contrato de reparación y remodelación de propiedades, en el cual se establece que el costo total del proyecto era de $18,095.00. La facturación del trabajo sería de un anticipo del 50% del precio total y el restante al culminar e inspeccionar la obra.

11. De conformidad con el contrato suscrito entre las partes, los trabajos debían culminar en o antes de treinta (30) días naturales.

12. Los trabajos a realizarse, según el contrato, eran los siguientes:
    1. Certificación de Utilidades (AAA/AEE)
    2. Lavado y sellado de techo residencia (sellador elastómerico)
    3. Acondicionamiento sistema eléctrico, panel, outlets, switch, rosetas
    4. Acondicionamiento de rejas exteriores, remoción de ventana
    5. Acondicionamiento de piscina
    6. Instalación de Calentador de línea (220V)
    7. Detectores de humo
    8. Lavamanos en el (1/2) baño
    9. Pintura interior/Exterior
    10. Instalación de Gabinetes (PVC) en cocina
    11. Remoción de Terraza en madera, Limpieza, recogido de escombros

13. Posteriormente, [las] partes acordaron que, por la urgencia de los siguientes trabajos, los mismos no los llevaría a cabo el querellado Alfredo Román Correa:
    Lavamanos en el (1/2) baño
    Instalación de Gabinetes (PVC) en cocina

14. El contrato establecía además que, "Todo trabajo anterior será realizado a las especificaciones e instrucciones de los propietarios. Cualquier alteración o desviación de las especificaciones arribas mencionadas, incluyendo vicios ocultos serán ejecutadas por órdenes escritas comunicadas y vendrá a ser un cargo adicional al estimado original".

15. El querellado Alfredo Román Correa tuvo la oportunidad de examinar la tasación del banco con las recomendaciones del tasador, en la cual se apreciaban las filtraciones del techo y el estado de deterioro de la piscina y de la propiedad en general.

16. La tasación de noviembre del 2018, estipulada por las partes, contiene un listado de trabajos a realizarse a un costo de $12,300.00, que no incluía algunas partidas que surgen del contrato de construcción, tales como gabinetes de cocina, y certificaciones de AAA y AEE.

17. Los querellantes hicieron el cierre hipotecario el 30 de noviembre de 2018, mediante escritura pública, ante notario Jorge Fernando Colón Montaner. En esta fecha se les hizo entrega de las llaves de la casa.

18. El primer pago al querellado Alfredo Román fue el 15 de diciembre de 2018. Al momento de cambiar el cheque, que era por $9,047.59, el querellado les devolvió a los querellantes la suma de $3,000.00 por concepto de los gabinetes que no trabajaría, por lo que retuvo $6,047.50 para comenzar la obra.

19. El querellado Alfredo Román Correa y sus empleados comenzaron la obra el 17 de diciembre del 2018. La casa estaba vacía en ese momento, sin la presencia de los querellantes. Los primeros trabajos que el querellado hizo en la casa de los querellantes **fue el sellado de techo y pintura interior**.

20. Los empleados estuvieron trabajando desde el 17 de diciembre del 2018 hasta el 28 de diciembre del 2018. **El querellado nunca les indicó a los querellantes que se iba a ausentar de la obra**.

21. **Como los querellantes tenían que desalojar el apartamento alquilado en o antes del 1 de enero de 2019, el coquerellante Francisco Hernández intentó comunicarse y le envió mensajes de texto al querellado, para saber el estatus de la obra, pero éste no aparecía.**

22. El 7 de enero de 2019, el coquerellante Francisco Hernández le escribió un correo electrónico a la funcionaria del banco, Dimarie Aldecoa, porque el querellado no aparecía a trabajar. Ese día, a las 10:24am, el querellado apareció en la propiedad. Los querellantes autorizaron su entrada, **ya que el deseo de éstos era poder mudarse y finalizar los trabajos**, e informaron al banco que el querellado se había reportado.

23. La parte querellante se trasladó a residir a la propiedad **la segunda semana del mes de enero del 2019**, por necesidad de desalojar el apartamento alquilado, conforme le habían advertido al querellado Alfredo Román cuando suscribieron el contrato de obra. Cuando los querellantes se mudaron a la casa, la propiedad estaba habitable.

24. Debido a que los querellantes se habían mudado a la propiedad, ni el querellado Alfredo Román Correa ni sus empleados podían hacer trabajos

dentro de la casa, mientras no estuviera alguno de los dueños o persona autorizada.

25. El querellado Alfredo Román Correa regresó a la obra con sus empleados el 7 de enero del 2019 y trabajaron hasta el 24 de enero de 2019. El querellado no volvió a la casa hasta el 4 de febrero de 2019, **fecha en que no regresó más a la obra**.

26. El 4 de febrero de 2019, el querellado Alfredo Román llegó a la casa acompañado de su empleado, y les notificó a los querellantes que venían a soldar un tubo del techo. El querellado les indicó que él había terminado los demás trabajos y que sólo faltaba la piscina.

27. El coquerellante Francisco Hernández le expresó al querellado Alfredo Román que faltaban muchos trabajos por hacer, como los eléctricos, la pintura y los cables del techo, y que había varias deficiencias en los trabajos realizados, entre ellos, las filtraciones. **El querellado les indicó que esos trabajos se quedaban así, que, si querían arreglarlos, tenían que pagar más dinero. El querellado se molestó y con palabras soeces, abandonó la casa**.

**28. Los querellantes notificaron a la Sra. Dimarie Aldecoa, a través de un correo electrónico, lo ocurrido con el querellado Alfredo Román Correa, por lo que se ordenó una inspección por parte del banco.**

29. El 13 de febrero de 2019, el Sr. Alex Santos Santos, por orden del banco, luego de realizar una inspección de la casa y llevar a cabo una nueva tasación, preparó un documento titulado "Compliance Inspection Report", de la que surgen las reparaciones que fueron hechas y las que no pudieron ser completadas por el querellado. En ese documento se especifica **que la piscina no fue reparada**.

30. En esta segunda ocasión, se expresa que las reparaciones no fueron completadas y que el valor estimado de la propiedad estaba sujeto a que las mismas se completaran. De no completarse las reparaciones, el valor del mercado de la propiedad se vería afectado, según el documento.

31. Ante esta situación, la parte querellante procedió a radicar una querella ante el Departamento contra el contratista Alfredo Román Correa, por derecho propio, el 20 de febrero de 2019. Esta querella fue enmendada posteriormente para incluir a la coquerellada Mapfre Praico Insurance Company.

32. Como parte de los procedimientos, el Departamento citó a todas las partes a una inspección de la propiedad objeto de la querella, con el Investigador de Querellas de Construcción, Sr.

José Carmona Longo, para el 19 de junio de 2019. A dicha inspección comparecieron la parte querellante y el querellado Alfredo Román Correa, ambos por derecho propio. **El inspector recomendó a la parte querellante someter estimado de costos por los trabajo mal hechos y por los que el querellado no realizó, el día de la vista administrativa**.

33. El informe sobre los hallazgos de la inspección realizada el 19 de junio de 2019 por el Sr. José Carmona Longo, y que fue notificado a las partes el 6 de agosto de 2019, consigna lo siguiente:
Hallazgos de la construcción según alegaciones de la querella:
   1. Certificaciones
      Ok.
   2. Reparación y tratamiento del techo
      Intervino, pero no ha sido efectivo, continúan las filtraciones.
   3. Trabajo completo de electricidad
      Realizado parcialmente.
   4. Reparación de rejas en segundo piso y remoción de ventana
      a. Pésima la reparación realizada
      b. La ventana fue removida
   5. Acondicionamiento de piscina
      Permanece sin el acondicionamiento
   6. Detectores de humo
      Mal instalados.
   7. Lavamanos en medio baño
      Ok.
   8. Pintura
      El trabajo realizado es uno pésimo.
   9. Gabinetes de cocina.
      Ok.
   10. Remoción de terraza en madera
      Ok.

34. Como parte del contrato, el querellado tenía que limpiar la piscina, pintarla y poner a funcionar el motor y los drenajes. La misma ya fue arreglada por un tercero que reparó los drenajes, poniéndola a funcionar, para finalmente marmolizarla.

35. El 2 de octubre de 2019, la parte querellante enmendó la querella para reclamar daños y perjuicios por el alegado incumplimiento del querellado. El 17 de octubre de 2019, la parte querellante enmendó la querella para incluir a Mapfre Insurance Company como parte coquerellada.

36. El Departamento citó a una nueva inspección para el 23 de enero de 2020, pero la misma no fue celebrada, ante la incomparecencia de la abogada de Alfredo Román y de un representante de Mapfre.

37. El 4 de septiembre de 2020, el Departamento llevó a cabo una segunda inspección técnica de la propiedad. El informe de inspección notificado el 8 de septiembre de 2020, consigna lo siguiente:

Se hizo una segunda inspección completa, en la cual estuvieron presentes las partes con sus respectivas abogadas.

1. La parte querellante ha realizado mejoras en la propiedad por iniciativa propia.
2. Se puede apreciar que la piscina está en uso y funcionando.
3. Se indica nuevamente que la parte querellante presentará estimado de costos por los trabajos mal hechos y los trabajos que el querellado nunca llegó a realizar el día en que se celebre la Vista Administrativa en el Departamento.
4. En adición le hará llegar copia de los mismos a la representación legal del querellado previo a que se celebre dicha Vista.

38. El 16 de octubre de 2020, los querellantes solicitaron una cotización para llevar a cabo las reparaciones que el querellado no completó, al Sr. Carmelo Hernández. Esta cotización no incluye trabajos de impermeabilización de techo.

39. El Sr. Carmelo Hernández testificó sobre la cotización de los trabajos no terminados o que fueron mal hechos por el querellado, y cuyo costo, a tenor con su cotización, asciende a $10,400.00. Este declaró lo siguiente:

a) Techo: que, a simple vista, cuando visitó la residencia de los querellantes, se veían los liqueos del techo y la corrosión en el piso por las goteras y por eso los puso en su cotización.
b) Que en su cotización puso la remoción de las losas a la orilla del techo, ya que los liqueos en la propiedad eran evidentes.
c) Al techo del closet que se encuentra en la marquesina había que aplicarle *primer* y sellador, ya que este trabajo no se había realizado.
d) Pintura Exterior: La casa parecía que no se pintaba hace mucho tiempo ni que se le hubiese pasado manguera de presión y había paredes mal pintadas.
e) Pintura Interior: Había que pintar la marquesina, el "family" y el plafón del techo, ya que esto estaba mal pintado.
f) Reja del segundo nivel: Había que remover tubos dañados y poner tubos nuevos, además que había que estirar los tensores, ya que éstos estaban sueltos. Este trabajo tampoco se había realizado.
g) Que la cotización que hizo fue con los costos y precios existentes para el año 2020, pero que los mismos han aumentado drásticamente, por lo que, cuando se realicen esos trabajos, la cotización podría aumentar.
h) Que en ningún momento se le mencionó nada acerca de los trabajos que había realizado el querellado ni se le había mostrado su cotización.

40. Los querellantes contrataron a Ricardo Serrano, perito electricista, debidamente licenciado por la Junta Examinadora de Peritos Electricistas del Departamento de Estado, licencia número 4080,

para reparar y/o terminar los trabajos de electricidad y energizar completamente la residencia.

**41.    Este perito fue quien cotizó los trabajos de electricidad, con posterioridad a los trabajos realizado por el querellado Alfredo Román. El perito electricista declaró durante la vista administrativa, que el panel de distribución de la casa, que tenía la tapa instalada, al remover la misma, reflejó que estaban sobrecargados los circuitos al ser conectados a un solo "breaker". Según el perito, en el caso de los "breakers" de 30 amperes, éstos no deben sobrepasar el 80% de su capacidad, porque al aplicar la carga, podrían ocasionar un incendio.**

**42.    Cuando el perito electricista Ricardo Serrano fue a verificar el panel de distribución, pudo detectar las diversas deficiencias eléctricas del trabajo realizado por el querellado, que eran contrarias a las disposiciones del Código Eléctrico.**

43.    El perito electricista encontró que el 60% de la casa no estaba energizada y procedió a corregir todas las deficiencias encontradas, entre ellas:
Remplazo de dos receptáculos regulares del cuarto máster con cables partidos, que hubo que re-alambrar y un receptáculo Ground fault del baño del cuarto máster
Reemplazo receptáculo Ground Fault en medio baño
Reemplazar receptáculo en family y donde va el abanico instalar un receptáculo
Reemplazar tres receptáculos de la terraza e instalar dos rosetas en el techo
Reemplazar dos receptáculos en el área del garaje
Reparar receptáculos en el gabinete de la cocina
Receptáculo de la columna de la verja de concreto y luminaria tuvo que ser alambrada
Reemplazar dos detectores de humo no cumplían con el Código Eléctrico
Se reemplazó caja del panel de distribución, con sus respectivos "breakers"

**44.    El perito Ricardo Serrano estableció que en el área de electricidad no puede haber vicios ocultos, y que los trabajos que debió realizar el querellado no constituían vicios ocultos, y que, de haber tenido un buen perito electricista, se hubiesen podido realizar correctamente los trabajos que cotizó en el contrato.**

45.    **El perito electricista Ricardo Serrano instaló detectores de humo nuevos y explicó la manera correcta de hacerlo, ya que habían sido mal instalados por el querellado.**

46.     La certificación eléctrica que el querellado entregó a los querellantes al inicio de las obra indicaba que todo estaba en perfecto estado; no indicaba que hubiese pillos ni ningún problema con el sistema eléctrico en la propiedad, así como tampoco con la conexión eléctrica *220*.

47.     Las fotos admitidas en evidencia demuestran las condiciones de las instalaciones eléctricas en la residencia, al momento de la inspección por parte del electricista.

48.     El perito electricista tuvo inconvenientes para energizar la terraza, porque tuvo que alambrar todo. En términos generales, el perito electricista encontró que los trabajos realizados con anterioridad a su intervención no fueron realizados por un perito electricista, porque los métodos utilizados no fueron los adecuados ni de conformidad con el Código eléctrico.

49.     El 16 de febrero de 2021, el perito electricista Ricardo Serrano emitió la certificación eléctrica, en la cual se establecen todos los trabajos de electricidad realizados.

50.     La certificación anterior del [perito] electricista Miguel A. Rivera por desuso, no refleja las deficiencias encontradas por el perito Ricardo Serrano, por lo que el perito concluye que dicha certificación estuvo basada en una simple inspección visual.

51.     Los querellantes pagaron al electricista Ricardo Serrano la suma de $2,826.43 por los trabajos eléctricos, mediante dos cheques que ya fueron cobrados.

52.     Los querellantes le dieron prioridad a la restauración de la piscina, porque era una cuestión de seguridad, ya que el agua estancada atraía mosquitos y constituía un peligro para sus hijos. El querellante le echó pastillas de cloro a la piscina, pero ello no resolvió el problema.

53.     Home Mortgage Bank autorizó el arreglo de la piscina y contrató a Fournier Professional Pool Service para el arreglo de la piscina, para lo cual el banco le pagó la suma de $9,075.00 que era el remanente del préstamo 203k que hicieron los querellantes para el arreglo de la propiedad.

54.     El costo de reparación de la piscina incluye la suma de $3,500.00 por concepto de marmolizado, **que el querellado no venía obligado a hacer.**

55.     Los querellantes han sufrido daños y angustias mentales como resultado del incumplimiento de la parte querellada.

56. Los querellantes, quienes tienen hijos menores de edad, no han podido disfrutar plenamente de su hogar, ya que se han visto afectados tanto emocionalmente como económicamente, como resultado de las deficiencias de la obra realizada por el querellado.
(Énfasis nuestro).

En virtud de lo anterior, DACO concluyó que las partes perfeccionaron un contrato de arrendamiento de obras. Añadió que, a base de la prueba documental y testifical, creída y admitida, el Sr. Román Correa fue negligente en el cumplimiento de su obligación, y que este no presentó prueba fehaciente que justificara por qué no cumplió con la obra en el término acordado de treinta (30) días naturales, ni con la reparación de los defectos de forma satisfactoria. En vista de lo anterior, DACO determinó que el Sr. Román Correa incumplió con su obligación al no realizar un trabajo satisfactorio y sin que mediara una razón justificada o fuerza mayor que le impidiera hacerlo. Por ello, DACO decretó la resolución del contrato y ordenó la devolución de las prestaciones.

En consecuencia, DACO ordenó al Sr. Román Correa devolver a los esposos Hernández Allende la suma de $6,047.50, la suma de $1,000.00 en concepto de los daños y angustias reclamados, más $2,000.00 en concepto de honorarios de abogado. Sobre las cuantías impuestas, DACO dispuso que MAPFRE respondería subsidiariamente hasta cubrir el monto de la fianza de $4,000.00.

Insatisfecho con el dictamen, el 1 de mayo de 2023, el Sr. Román Correa solicitó reconsideración, la cual DACO rechazó de plano, al transcurrir el término dispuesto sin que acogiera la misma.

Inconforme aún, el 12 de junio de 2023, el recurrente acude ante este foro apelativo y formuló los siguientes señalamientos de error:

A. Erró la agencia al imponer honorarios de abogado al recurrente ante la ausencia de temeridad.

B. Erró la agencia al imponer daños y perjuicios al recurrente ante falta de prueba.

C. Erró la agencia al no acreditar al recurrente los trabajos que fueron realizados y aceptados por la propia agencia y la propia parte recurrida.

El 12 de julio de 2023, los esposos Hernández Allende presentaron *Alegato en Oposición a Revisión*. Con el beneficio de la comparecencia de las partes, estamos en posición de resolver.

**II.**

**A.**

Es norma firmemente establecida que los tribunales apelativos han de conceder gran consideración y deferencia a las decisiones de los organismos administrativos. Ello, dado que las agencias administrativas cuentan con vasta experiencia y conocimiento especializado en cuanto a los asuntos que les han sido encomendados.[10]

Como resultado, la decisión de una agencia administrativa gozará de una presunción de legalidad y corrección que será respetada, siempre que la parte que la impugna no produzca evidencia suficiente para rebatirla.[11] Así, en cuanto a las determinaciones de hecho que realiza una agencia, el Tribunal Supremo ha resuelto que los tribunales revisores tienen que sostenerlas si se encuentran respaldadas por evidencia suficiente que surja del expediente administrativo al ser considerado en su totalidad.[12] Por evidencia sustancial se entiende "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión".[13]

---

[10] *Moreno Lorenzo y otros v. Depto. Fam.*, 207 DPR 833, 839 (2021), citando a *OCS v. Universal*, 187 DPR 164, 178 (2012); *The Sembler Co. v. Mun. de Carolina*, 185 DPR 800 (2012); *Pagán Santiago, et al. v. ASR*, 185 DPR 341, 358 (2012).
[11] *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 215 (2012).
[12] *Pacheco v. Estancias*, 160 DPR 409, 432 (2003). Véase, además, Sec. 4.5 de la LPAU, 3 LPRA sec. 9675.
[13] *Rolón Martínez v. Superintendente*, 201 DPR 26, 36 (2018); *González Segarra et al. v. CFSE*, 188 DPR 252, 277 (2013); *Otero v. Toyota*, 163 DPR 716, 728-729 (2005).

Por lo tanto, la parte afectada deberá reducir el valor de la evidencia impugnada o demostrar la existencia de otra prueba que sostenga que la actuación del ente administrativo no estuvo basada en evidencia sustancial.[14] En fin, el tribunal debe limitar su intervención a evaluar si la determinación de la agencia es razonable, ya que se persigue evitar que el tribunal revisor sustituya el criterio de la agencia por el suyo.[15]

Por otro lado, respecto a las conclusiones de derecho, la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico,* Ley Núm. 38-2017, señala que éstas pueden ser revisadas en todos sus aspectos.[16] Ahora bien, lo anterior "no implica que los tribunales revisores tienen la libertad absoluta de descartar libremente las conclusiones e interpretaciones de la agencia".[17] Consecuentemente, cuando un tribunal llega a un resultado distinto al de la agencia, éste debe determinar si la divergencia es a consecuencia de un ejercicio razonable y fundamentado de la discreción administrativa, ya sea por la pericia, por consideraciones de política pública o en la apreciación de la prueba.[18] Dicho de otro modo, "[e]l tribunal podrá sustituir el criterio de la agencia por el propio solo cuando no pueda hallar una base racional para explicar la decisión administrativa".[19]

Por consiguiente, la deferencia concedida a las agencias administrativas únicamente cederá cuando: (1) la determinación administrativa no esté basada en evidencia sustancial; (2) el organismo administrativo haya errado en la aplicación o interpretación de las leyes o los reglamentos que se le ha encomendado administrar; (3) cuando el organismo administrativo

---

[14] *Otero v. Toyota,* supra, pág. 728.
[15] *Íd.*
[16] Sec. 4.5 de la LPAU, 3 LPRA sec. 9675.
[17] *Otero v. Toyota,* supra, pág. 729.
[18] *Otero v. Toyota,* supra, pág. 729.
[19] *Íd.*

actúe arbitraria, irrazonable o ilegalmente, al realizar determinaciones carentes de una base racional; o, (4) cuando la actuación administrativa lesione derechos constitucionales fundamentales.[20]

**B.**

El Departamento de Asuntos del Consumidor (DACO) fue creado en virtud de la Ley Núm. 5 de 23 de abril de 1973, 3 LPRA sec. 341 *et seq.*, con el propósito primordial de proteger, vindicar e implementar los intereses y derechos de los consumidores en Puerto Rico. Este organismo fue dotado con amplias facultades para dictar las acciones correctivas que fueren necesarias para cumplir con el mandato de su ley habilitadora de proteger a los consumidores; adjudicar las querellas que se traigan ante su consideración y conceder los remedios procedentes conforme a derecho, incluidas las compensaciones económicas, si procedieran; establecer las reglas y normas necesarias para la conducción de los procedimientos administrativos e interponer cualesquiera remedios legales que fueran necesarios para hacer efectivos los propósitos de la ley, entre otros.[21] El Artículo 8 (a) dispone que el Secretario del DACO tendrá poder para aprobar, enmendar o revocar aquellas reglas, reglamentos, órdenes, resoluciones y determinaciones necesarias al cumplimiento de esta ley.[22]

**C.**

La sección 3.21 de la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAU), Ley Núm. 38 de 30 de junio de 2017, autoriza a las agencias a imponer costas y honorarios de abogado en los procesos adjudicativos ante sí en los mismos

---

[20] *Super Asphalt v. AFI y otros,* 206 DPR 803, 819 (2021); *Torres Rivera v. Policía de Puerto Rico,* 196 DPR 606, 628 (2016); *IFCO Recycling v. Aut. Desp. Sólidos,* 184 DPR 712, 744-745 (2012).
[21] 3 LPRA sec. 341e (d), (g) e (i); *Suárez Figueroa v. Sabanera Real,* 173 DPR 694, 704 (2008); *Quiñones v. San Rafael Estates, S.E.,* 143 DPR 756, 765-767, 769 (1997).
[22] 3 LPRA § 341g.

casos que dispone la Regla 44 de Procedimiento Civil.[23] El *Reglamento de Procedimientos Adjudicativos de DACO* recoge esta facultad administrativa dispuesta en la LPAU al establecer que el funcionario, Secretario o Panel de Jueces que presida la vista podrá imponer a la parte perdidosa el pago de costas y honorarios de abogados, según lo dispuesto en la Regla 44 de Procedimiento Civil. Sobre el particular, la Regla 20 establece lo relacionado al procedimiento de vistas administrativas. En específico, la Regla 20.2 dispone que el Departamento podrá condenar al pago de honorarios de abogado o dictar cualquier otra orden que en derecho proceda. Más adelante, la Regla 27.5 establece lo siguiente:

> El funcionario, Secretario o Panel de Jueces que presida la vista podrá imponer a la parte perdidosa el pago de costas y honorarios de abogado. *El procedimiento se regirá por lo dispuesto en la Regla 44 de la Ley (sic) de Procedimiento civil de Puerto Rico de 2009, según enmendada.*

**D.**

La Regla 44.1, inciso (d) provee para la concesión de honorarios de abogado en casos donde cualquiera de las partes o sus abogados hayan procedido con temeridad o frivolidad.[24]  En específico, la mencionada regla establece lo siguiente:

> (d) Honorarios de abogado.— En caso que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta. En caso que el Estado Libre Asociado de Puerto Rico, sus municipios, agencias o instrumentalidades haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia una suma por concepto de honorarios de abogado, excepto en los casos en que esté expresamente exento por ley del pago de honorarios de abogado.

---

[23] 3 LPRA sec. 9661(c).
[24] 32 L.P.R.A. Ap. V, R. 44.1.

El Tribunal Supremo ha dispuesto que "[l]a temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia".[25]  El propósito de los honorarios de abogados es sancionar al litigante perdidoso que por su temeridad, obstinación, contumacia e insistencia en una actitud frívola o desprovista de fundamento, obliga a la otra parte a asumir innecesariamente las molestias, gastos, trabajo e inconveniencias de un pleito.[26]  La imposición de honorarios por temeridad descansa en la discreción de la agencia. Cuando una agencia administrativa ejerce su discreción al imponer honorarios de abogado, dicha determinación no será alterada por los tribunales a menos que haya mediado un abuso en ella.[27] En cuanto al determinación de temeridad, y pertinente a la controversia ante nuestra consideración, en *Rivera v. Tiendas Pitusa, Inc.*, 148 DPR 695 (1999), el Tribunal Supremo reiteró lo siguiente:

> La condena en honorarios de abogado es imperativa cuanto el tribunal sentenciador concluye que una parte ha sido temeraria. *En ausencia de una conclusión expresa a tales efectos, un pronunciamiento en la sentencia que condene al pago de honorarios de abogado, implica que el tribunal sentenciador consideró temeraria a la parte así condenada. Por lo tanto, al imponerle los honorarios de abogado, el tribunal de instancia implícitamente realizó una determinación de temeridad.* (Énfasis suplido.)

El Tribunal Supremo ha establecido que existe temeridad en las siguientes circunstancias: (1) hacer necesario un pleito que se pudo evitar; (2) prolongar innecesariamente un pleito; (3) causar que otra parte incurra en gestiones evitables; (4) contestar el demandado una demanda y negar su responsabilidad total, aunque la acepte posteriormente; (5) cuando el demandado se defiende injustificadamente de la acción; (6) si el demandado en efecto cree que la cantidad reclamada es exagerada y esa es la única razón que

---

[25] *Jarra Corp. v. Axxis Corp.*, 155 D.P.R. 764 (2001).
[26] *Quiñones v. San Rafael Estates*, S.E., supra, pág. 777.
[27] *Íd.*

tiene para oponerse a las peticiones del demandante y no admite francamente su responsabilidad, limitando la controversia a la fijación de la cuantía a ser concedida; (7) si el demandado se arriesga a litigar un caso del que se desprendía *prima facie* su negligencia; y (8) negar un hecho que le consta es cierto al que hace la alegación.[28]

La partida de honorarios de abogado concedida no se variará en apelación, a menos que la misma sea excesiva, exigua o constituya un abuso de discreción.[29]

**III.**

Comenzaremos por establecer que, aun cuando el Sr. Román Correa ataca la apreciación de la prueba testifical desfilada en la vista, particularmente la adjudicación de credibilidad a los testimonios, este no cumplió su obligación de solicitar que se le autorizara preparar una exposición narrativa o una transcripción de la prueba oral. Regla 66 del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B. R. 66. Por lo tanto, no nos ha puesto en condición de evaluar ningún señalamiento de error basado en la errónea apreciación de la prueba oral. Así pues, sin contar con otra evidencia más allá de las alegaciones del recurrente, este Tribunal no está en posición de ejercer su función revisora sobre el segundo y tercer señalamiento de error. De modo que, para resolver este recurso nos basaremos en los hechos, según determinados por el DACO.

En primer lugar, atenderemos el segundo señalamiento de error. En este, el Sr. Román Correa plantea que la agencia incidió al imponer daños y perjuicios a pesar de la insuficiente prueba de daños presentada. En específico, arguye que, para establecer los daños, los recurridos presentaron sus propios testimonios, que calificó de estereotipados, sin prueba pericial médica alguna que los sustentara. Arguye que, los daños reclamados fueron provocados

---

[28] *Fernández v. San Juan Cement Co., Inc.*, 118 DPR 713, 718-719 (1987).
[29] *Ramírez v. Club Cala de Palmas*, 123 DPR 339 (1989).

por los propios recurridos, pues si estos le hubieran permitido terminar el trabajo y no lo hubieran removido de la obra, esta se hubiera terminado de forma satisfactoria. Por su parte, los esposos Hernández Allende sostienen que DACO adjudicó credibilidad a la prueba testifical desfilada y que el Sr. Román Correa no presentó prueba alguna para impugnar la misma.

Resulta menester recalcar la importancia de la norma de deferencia que cobija las determinaciones hechas por las agencias administrativas. Como regla general, dicha norma establece que tales determinaciones serán sostenidas. Solamente, a modo de excepción, este Tribunal podrá desplazar el criterio de las agencias administrativas en casos de un claro abuso de discreción, error manifiesto o prejuicio. También podemos sustituir el criterio de las agencias recurridas cuando sus determinaciones no están sostenidas por prueba que obra en el expediente administrativo.

En el presente caso, las determinaciones de hechos consignan que el deseo de los esposos Hernández allende era mudarse al inmueble en enero de 2019, y así se lo advirtieron al Sr. Román Correa cuando suscribieron el contrato de obra.[30] Los trabajos de reparación se realizaron a partir del 17 de diciembre de 2018, hasta el 28 de diciembre de 2018.[31] Se continuó con dichos trabajos del 7 de enero de 2019, al 24 de enero de 2019.[32] El 4 de febrero de 2019, el Sr. Román Correa regresó a la residencia para efectuar una última reparación. Ese día, el coquerellante Francisco Hernández le expresó al recurrente que faltaban muchos trabajos por hacer, como los eléctricos, la pintura y los cables del techo, y que había varias deficiencias en los trabajos realizados. El Sr. Román Correa le indicó que los trabajos se quedaban así, y que, si querían arreglarlos,

---

[30] Determinaciones de hecho núms. 7, 22 y 23.
[31] Determinación de hechos núm. 20.
[32] Determinación de hechos núm. 25.

tenían que pagar más dinero.[33] El informe de inspección de la casa realizado por el banco el 13 de febrero de 2019, especifica que la piscina no fue reparada.[34] La piscina fue arreglada por un tercero que reparó los drenajes, la puso a funcionar y la marmolizó. El DACO reconoció que el recurrente no se comprometió a hacer el marmolizado.[35] Los esposos Hernández Allende solicitaron al Sr. Carmelo Hernández una cotización para llevar a cabo las reparaciones que el recurrente no realizó. Este testificó en detalle la cotización efectuada.[36] También los recurridos contrataron al perito electricista Ricardo Serrano, quien testificó sobre sus hallazgos y corrección de las deficiencias encontradas.[37] Las fotos admitidas en evidencia demuestran las condiciones de las instalaciones eléctricas al momento de la inspección por parte del electricista.[38] Los esposos Hernández Allende pagaron al Sr. Ricardo Serrano por los trabajos eléctricos.[39]

El juez administrativo del DACO sopesó la prueba presentada, sopesó credibilidad y concluyó que el Sr. Román Correa se obligó a realizar las reparaciones a la residencia, que no atendió oportunamente las reclamaciones de los recurridos y que la mayoría de los trabajos los realizó de manera defectuosa. Basado en tales determinaciones, concluyó que el recurrente incumplió con sus obligaciones contractuales, lo que obligó a los esposos Hernández Allende a incurrir en gastos para acondicionar la casa. Así pues, la determinación de daños y perjuicios está amparada en las determinaciones del DACO y en la norma general de responsabilidad dispuesta en el Código Civil que dispone que la persona que de cualquier modo contraviene su obligación debe indemnizar por los

---

[33] Determinaciones de hecho núms. 26 y 27.
[34] Determinación de hechos núm. 29.
[35] Determinaciones de hechos núms. 34 y 54.
[36] Determinaciones de hecho núms. 38 y 39.
[37] Determinaciones de hecho núms. 40-45, 48-49.
[38] Determinación de hecho núm. 47.
[39] Determinación de hecho núm. 51.

daños y perjuicios causados.[40] La misma es razonable y ante la ausencia de pasión, prejuicio o parcialidad, debe sostenerse.

En su tercer señalamiento de error, el Sr. Román Correa alega que la agencia incidió al no acreditar los trabajos que sí fueron realizados y aceptados. Alega que la controversia no era sobre trabajos mal realizados, sino de trabajos que no pudieron ser completados por las acciones de los recurridos. Añade que los recurridos nunca pagaron la totalidad de lo acordado ni las modificaciones o trabajos adicionales que le solicitaron. En su escrito, efectuó un desglose de los acuerdos escritos, así como de las órdenes de cambio o modificaciones verbales presuntamente solicitadas y consentidas por los recurridos. También reseñó las tareas realizadas y aceptadas por los recurrentes y aquellos trabajos adicionales efectuados, pero no pagados por los recurrentes. Al respecto, los esposos Hernández Allende arguyen que los trabajos realizados estuvieron mal hechos, lo cual quedó demostrado en la vista administrativa, así como de los informes de inspección.

Surge del expediente que la obra realizada por el recurrente adolecía de algunos defectos, los cuales fueron verificados por DACO durante las inspecciones realizadas. Así, la inspección del DACO de 19 de junio de 2019[41] consignó que la reparación y tratamiento del techo no fue efectiva, pues continuaban las filtraciones; que el trabajo de electricidad se realizó de manera parcial; que la reparación de las rejas del segundo piso y del trabajo general de pintura fueron de pésima calidad; la piscina no estaba en condiciones adecuadas y que los detectores de humo estaban mal instalados. Como obras realizadas, la misma inspección señaló que se removió una ventana; que existían certificaciones (que no

---

[40] Art. 1158 Código Civil de Puerto Rico, 31 LPRA Sec. 9303; anterior Art. 1054 del Código Civil de 1930, 31 LPRA sec. ant. 3018.
[41] Determinación de hecho núm. 33.

reflejaron las deficiencias encontradas por el perito electricista Ricardo Serrano[42]); y que se removió la terraza en madera. La inspección también señaló que se instalaron los gabinetes de cocina y que se colocó el lavamanos en el medio baño; no obstante, el propio recurrente ha admitido y el DACO determinó que ese trabajo lo realizó una tercera persona.[43]

La segunda inspección del DACO, de 4 de septiembre de 2020[44], reflejó que los esposos Hernández Allende realizaron mejoras a la propiedad por iniciativa propia y que, de hecho, el inspector apreció que la piscina estaba en uso y funcionado.

Surge además de las determinaciones de la agencia, que el inspector del DACO recomendó a los recurridos presentar un estimado de costos por los trabajos mal hechos o incompletos.[45] Uno de estos estimados lo realizó el Sr. Carmelo Hernández a petición de los recurridos. La cotización corroboró las filtraciones del techo, el mal estado de la pintura del interior y exterior de la casa, y la necesidad de reparar las rejas del segundo nivel.[46] Los trabajos de electricidad los revisó el Sr. Ricardo Serrano, quien declaró sobre el mal estado de las instalaciones eléctricas y los trabajos realizados para corregir las deficiencias.[47]

Las determinaciones de la agencia recurrida no respaldan las siguientes modificaciones verbales reclamadas por el Sr. Román Correa en su recurso. Específicamente nos referimos a la limpieza de la piscina ($500.00), la realización de dos entradas en la parte baja de la residencia ($350.00), el lavado y sellado de parte del techo ($3,000.00), calentador de línea ($405.00), detectores de humo ($200.00), pintura interior en la segunda planta ($600.00), pintura

---

[42] Determinaciones de hecho núms. 46 y 50.
[43] Determinaciones de hecho núm. 13 y 18.
[44] Determinación de hecho núm. 37.
[45] Determinaciones de hecho núms. 32 y37.
[46] Determinación de hecho núm. 39.
[47] Determinaciones de hecho núms. 40-45.

interior en la segunda planta ($600.00), pintura exterior en el segundo nivel ($600.00), trabajos adicionales en las rejas exteriores y ventanas ($1,000.00) y las 24 láminas de cristal instaladas en las ventanas, para las cuales no identificó valor pecuniario.

Ahora bien, las determinaciones de hechos de la resolución recurrida manifiestamente exponen que el Sr. Román Correa realizó satisfactoriamente los siguientes trabajos especificados en el contrato que suscribió con los recurridos: (1) remoción de la terraza en madera y recogido de escombros ($390.00), (2) remoción de la ventana ($125.00, que constituye la mitad de la labor contratada por concepto del acondicionamiento de rejas y remoción de ventanas) y (3) certificación de utilidades ($450.00); para un total de $1,415.00. Por consiguiente, corresponde ordenar a los esposos Hernández Allende reembolsar al Sr. Román Correa la suma de $1,415.00 por concepto de los trabajos que efectivamente realizó en la residencia.

El Sr. Román Correa aduce, además, que DACO incidió al imponerle honorarios de abogado. Lo anterior, porque a su entender, no incurrió en temeridad y la agencia recurrida tampoco hizo una determinación de frivolidad o temeridad en la resolución recurrida.

Por su parte, en su alegato en oposición, los esposos Hernández Allende sostienen que el Sr. Román Correa fue temerario al "pretender defenderse de las alegaciones del querellante cuando resultó obvio, para todas las personas que realizaron inspecciones en la propiedad, que las obras y reparaciones contratadas o no fueron realizadas o fueron mal realizadas."[48]

Según expuesto en la segunda parte de este escrito, cuando un tribunal impone a una parte el pago de honorarios sin hacer una

---

[48] Véase, *Alegato en Oposición a Revisión,* pág. 5.

determinación previa de temeridad, implícitamente se entiende que el juzgador encontró temeraria a la parte así condenada. Sin embargo, no encontramos que el expediente sustente determinación de temeridad alguna que justifique la imposición de los honorarios de abogado al Sr. Román Correa. No surge del expediente indicio alguno que demuestre que el recurrente actuara de forma temeraria, contumaz, frívola o sin fundamento al defenderse de las alegaciones en su contra. Por el contrario, éste levantó las defensas que entendió le asistían para que fueran dirimidas por el juez administrativo. En virtud de todo lo anterior, modificamos la resolución recurrida a los efectos de eliminar la suma de $2,000.00 que le fue impuesta al Sr. Román Correa por concepto de honorarios de abogado.

**IV**.

Por los fundamentos expuestos, se modifica la resolución recurrida, a los efectos de que disponga que los esposos Hernández Allende deberán reembolsar al Sr. Román Correa la suma de $1,415.00 por concepto de los trabajos que efectivamente realizó en la residencia, y de eliminar la suma de $2,000.00 que le fue impuesta al Sr. Román Correa por concepto de honorarios de abogado. Así modificada, se confirma la resolución recurrida.

Notifíquese.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones