ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| **ISRAEL BAUTISTA RAMOS RIVERA y OTROS**<br><br>Apelantes<br><br>v.<br><br>**ANGIEMIVA PAGÁN MARRERO**<br><br>Apelada | KLAN202301120 | **APELACIÓN** procedente del Tribunal de Primera Instancia, Sala de **San Juan**<br><br>Civil Núm.: **SJ2022CV02381**<br><br>Sobre: Cumplimiento Específico, Incumplimiento de Contrato y Daños y Perjuicios |

Panel integrado por su presidente, el Juez Pagán Ocasio, el Juez Marrero Guerrero y la Jueza Boria Vizcarrondo[1].

Boria Vizcarrondo, Jueza Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 21 de agosto de 2024.

Comparecen ante este Foro, mediante recurso de *Apelación*, el señor Israel Bautista Ramos Rivera (Sr. Ramos) y la señora Santa Aida Rivera Souffront (Sra. Rivera) (en conjunto, matrimonio Ramos-Rivera o Apelantes). Mediante dicho recurso, nos solicitan que revoquemos la *Sentencia Parcial*[2] emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI), en donde el TPI declaró Ha Lugar a la *Moción de Nulidad de Contrato de Compraventa*[3] y No Ha Lugar a la *Moción Solicitando Sentencia Sumaria Parcial*[4].

Por las razones que discutimos en adelante, revocamos la *Sentencia Parcial*.

---

[1] Mediante la Orden Administrativa OATA-2024-021 de 2 de febrero de 2024, se designó a la Hon. Lersy G. Boria Vizcarrondo como integrante de este Panel Especial en sustitución del Hon. Roberto J. Sánchez Ramos.
[2] Apéndice de *Apelación*, Anejo I, págs. 1-18. Notificada y archivada en autos el 12 de octubre de 2023.
[3] *Íd.*, Anejo XXIII, págs. 918-939.
[4] *Íd.*, Anejo XXV, págs. 1213-1240.

**I.**

Para enero de 2008, el Sr. Ramos se mudó a la segunda planta de la propiedad localizada en la Calle Santa Cecilia #59, San Juan, PR 00911 (la Propiedad), en calidad de arrendatario. Pactó aquel contrato de arrendamiento con la señora Josefina Aurora Marrero Fossé (Sra. Marrero), quien vivía para aquel entonces en la primera planta de la Propiedad. En agosto de 2008, la Sra. Rivera se mudó a la Propiedad como pareja del Sr. Ramos.

Luego de varios años viviendo en la Propiedad en calidad de arrendatarios, el 4 de noviembre de 2010, los Apelantes pactaron un *Contrato de Opción de Compraventa* (*Contrato*) con la Sra. Marrero, mediante el cual la Sra. Marrero se obligó a venderle ambas plantas de la Propiedad a los Apelantes por el precio de $125,000.00.[5] Las partes pactaron que los Apelantes le pagarían a la Sra. Marrero un depósito de $75,000.00 en aquel momento, en calidad de adelanto del precio de compraventa. La Sra. Marrero, por su parte, se obligó a no "vender, ceder o transferir en forma alguna la propiedad objeto de la presente transacción en lo que los [Apelantes] saldan el balance de precio de compraventa, es decir CINCUENTA MIL DÓLARES ($50,000.00)".[6] Las partes añadieron, además, una cláusula resolutoria para disponer lo que ocurrirá si no se resuelve el *Contrato* según pactado. Esta cláusula dispone que:

> 5. Si por causas ajenas a su voluntad, los [Apelantes] no saldan el balance del precio de compraventa, es decir CINCUENTA MIL DÓLARES ($50,000.00), [la Sra. Marrero] devolverá la cantidad total del depósito [a los Apelantes]. Si por el contrario, los [Apelantes] desisten de llevar a cabo esta compraventa, [la Sra. Marrero] retendrá la cantidad de DIEZ MIL DÓLARES ($10,000.00) y le devolverá a los [Apelantes] los SESENTA Y CINCO MIL DÓLARES ($65,000.00).[7]

---

[5] *Íd.*, Anejo VI, págs. 203-207.
[6] *Íd.*, pág. 204.
[7] *Íd.*, págs. 204-205.

Así como pactaron las partes, los Apelantes depositaron $75,000.00 en la cuenta número 3739075 del Banco Popular First Community Bank en Florida. Aproximadamente cuatro meses después, los Apelantes le ofrecieron a la Sra. Marrero los $50,000.00 para cumplir con lo pactado y llevar a cabo la opción en su totalidad.[8] No obstante, por razones desconocidas, la Sra. Marrero no aceptó el dinero.[9] Alrededor de dos a tres meses después, los Apelantes volvieron a intentar a entregarle a la Sra. Marrero los restantes $50,000.00 pero no la pudieron localizar. Aparentemente, la Sra. Marrero se mudó de la primera planta de la Propiedad sin informarle a los Apelantes. Aun así, los Apelantes continuaron viviendo en la Propiedad, en calidad de arrendatarios e incurriendo en gastos necesarios y útiles.[10] Dichos gastos ascendieron a $266,343.85.[11]

Así las cosas, el 29 de marzo de 2022, los Apelantes presentaron una *Demanda* ante el TPI para exigir el cumplimiento específico del *Contrato* y recobrar daños y perjuicios sufridos al asumir las obligaciones propietarias de la Sra. Marrero.[12] Tras varios trámites procesales, la parte demandada fue emplazada por edicto, y tras su incomparecencia, el 11 de mayo de 2022, el TPI le anotó la rebeldía.[13] El juicio en rebeldía se celebró el 6 de junio de 2022 y el 7 de junio de 2022 el TPI declaró Ha Lugar a la *Demanda*.[14]

El 7 de julio de 2022, compareció la señora Angiemiva Pagán Marrero (Sra. Pagán o Apelada), única heredera de la Propiedad según el *Testamento Abierto* de la Sra. Marrero, suscrito ante notario

---

[8] *Íd.*, Anejo II, págs. 64-65.
[9] *Íd.*
[10] Tomamos conocimiento judicial del caso SJ2022CV02381 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC), Entrada Núm. 1, Anejo 3. (Aunque dicho documento aparece en el Índice del recurso de *Apelación*, el mismo no fue incluido en el Apéndice).
[11] *Íd.*
[12] Apéndice, *supra*, Anejo VII, págs. 208-214.
[13] *Íd.*, Anejo IX, págs. 236.
[14] *Íd.*, Anejos X y XI, págs. 240-252.

el 9 de marzo de 2005.[15] Mediante *Moción Asumiendo Representación Legal y Se Deje Sin Efecto Sentencia Emitida,* la Sra. Pagán informó que existía otro caso pendiente ante el Tribunal de Primera Instancia en contra de los Apelantes de desahucio y cobro de dinero.[16] Además, le informó al TPI que la Sra. Marrero falleció el 6 de noviembre de 2014. Alegó que en virtud de ser la heredera de la Propiedad, era parte indispensable en el pleito de autos, por lo que solicitó que se dejara sin efecto la *Sentencia* de 7 de junio de 2022. El 29 de julio de 2022, el TPI emitió una *Orden* dejando sin efecto su *Sentencia.*

Tras varios trámites procesales, y con la participación de la Sra. Pagán en los procedimientos, el 28 de julio de 2023, la Sra. Pagán presentó una *Moción Sobre Nulidad de Contrato de Opción de Compraventa,*[17] en la que arguyó que, entre otras razones, el *Contrato* deber ser declarado nulo por no establecer un término o plazo fijo para ejercer la opción. El 31 de agosto de 2023, los Apelantes, por su parte, presentaron una *Moción Solicitando Sentencia Sumaria Parcial,* en la que solicitaron que el TPI les permitiera consignar los $50,000.00 restantes del *Contrato,* $10,000.00 en daños y $8,000.00 en honorarios.[18]

Así las cosas, el 10 de octubre de 2023, el TPI dictó la *Sentencia* recurrida. Mediante dicha determinación, resolvió declarar Ha Lugar a la *Moción Sobre Nulidad de Contrato de Opción de Compraventa* presentada por la Sra. Pagán y No Ha Lugar a la *Moción Solicitando Sentencia Sumaria* presentada por los Apelantes. Concluyó que:

> A la luz de las determinaciones antes expuestas, el Tribunal concluye que el aludido Contrato es nulo, pues el mismo carece de uno de los elementos esenciales de ese tipo de contrato, el plazo. Véase *Mayagüez Hilton Corp. v. Betancourt,* [156 DPR 234, 246

---

[15] Entrada Núm. 26, Anejo 4 en SUMAC.
[16] Apéndice, *supra,* Anejo XII, págs. 253-256.
[17] *Íd.*, Anejo XXIII, págs. 903-917.
[18] *Íd.*, Anejo XXV, págs. 1213-1240.

(2002)]. En consecuencia, se determina que no existe ninguna obligación entre los demandantes y la parte demandada a esos efectos.[19]

Inconforme con aquella determinación, y luego de infructuosamente presentar una *Moción de Reconsideración,*[20] el 14 de diciembre de 2023, el matrimonio Ramos-Rivera presentó el recurso de *Apelación* ante nuestra consideración. En dicha comparecencia, presentó los siguientes señalamientos de error:

> **PRIMER ERROR: ERRÓ EL TPI AL DESESTIMAR LA *DEMANDA* DE LA PARTE DEMANDANTE Y DETERMINAR QUE EL *CONTRATO DE [O]PCION DE COMPRAVENTA* FIRMADO EL 10 DE NOVIEMBRE DE 2020 NO TENÍA UN PLAZO SEGÚN DEFINIDO POR LA JURISPRUDENCIA Y EL CÓDIGO CIVIL DE PUERTO RICO 1930.**

> **SEGUNDO ERROR: ERRÓ EL TPI AL DESESTIMAR LA *DEMANDA* DE LA PARTE APELANTE Y DETERMINAR QUE EL *CONTRATO DE [O]PCIÓN DE COMPRAVENTA* FIRMADO EL 10 DE NOVIEMBRE DE 2010 NO TENÍA UN PLAZO CIERTO APLICANDO ASÍ LOS REQUISITOS DE UN CONTRATO DE OPCIÓN DE COMPRAVENTA DEL CÓDIGO CIVIL DE PUERTO RICO 2020.**

> **TERCER ERROR: ERRÓ EL TPI AL DESESTIMAR LA *DEMANDA* DE LA PARTE APELANTE Y DETERMINAR QUE LOS APELANTES HABÍAN INDICADO QUE EL *CONTRATO DE OPCIÓN DE COMPRAVENTA* NO TENÍA UN PLAZO, SEGÚN DISPUSO EN LOS HECHOS NO CONTROVERTIDOS 10 Y 30 DE LA *SENTENCIA,* CUANDO DE LAS DEPOSICIONES E INTERROGATORIOS LOS APELANTES CLARAMENTE EXPRESARON QUE EL *CONTRATO DE OPCIÓN DE COMPRAVENTA* TENÍA UN PLAZO Y QUE EL MISMO LO EJERCIERON.**

> **CUARTO ERRO: ERRÓ EL TPI AL DESESTIMAR LA *DEMANDA* DE LA PARTE APELANTE Y NO DETERMINAR COMO HECHO NO CONTROVERTIDO QUE LOS APELANTES EJERCIERON SU DERECHO DE OPCIÓN EN EL *CONTRATO DE OPCIÓN DE COMPRAVENTA,* QUEDANDO ENTONCES PERFECCIONADO EL CONTRATO DE COMPRAVENTA, INCUMPLIENDO JOSEFINA AURORA MARRERO FOSSÉ CON EL MISMO A TENOR CON <u>MAYAGÜEZ HILTON CORP. V. BETANCOURT,</u> SUPRA. <u>Y EL CÓDIGO CIVIL DE PUERTO RICO 1930.</u>**

> **QUINTO ERROR: ERRÓ EL TPI AL DESESTIMAR LA *DEMANDA* DE LA PARTE APELANTE Y NO APLICAR**

---

[19] *Íd.,* Anejo I, pág. 17.
[20] *Íd.,* Anejo II, págs. 19-34.

**EL CASO MAYAGÜEZ HILTON CORP. V. BETANCOURT, SUPRA. Y EL CÓDIGO CIVIL DE PUERTO RICO 1930, TENIENDO UN CONTRATO PERFECCIONADO.**

**SEXTO ERROR: ERRÓ EL TPI AL DESESTIMAR LA *DEMANDA* DE LA PARTE APELANTE Y DETERMINAR QUE EL *CONTRATO DE OPCIÓN DE COMPRAVENTA* ERA NULO [TODA VEZ] QUE EL TÉRMINO PARA DECRETAR LA NULIDAD HABÍA EXPIRADO, EL TÉRMINO PARA EJERCER LA NULIDAD DE CONTRATO ES DE 4 AÑOS SEGÚN DISPONE EL CÓDIGO CIVIL DE PUERTO RICO DE 1930.**

**II.**

**A.**

La obligación "consiste en el deber de realizar una prestación. Esta es la conducta que ha de seguir el obligado para extinguir la obligación mediante el correspondiente acto de cumplimiento". J. Puig Brutau, *Compendio de derecho civil*, 2ª ed. rev., Barcelona, Ed. Bosch, 1994, Vol. II, pág. 1. De particular interés a nuestro análisis son las obligaciones que nacen de los contratos.

Un contrato es el negocio jurídico entre dos o más personas donde las partes contratantes se obligan a dar, hacer o no hacer una cosa. El Artículo 1044 del Código Civil de 1930,[21] (30 LPRA sec. 2994) (Código Civil de 1930) dispone que "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse a tenor de los mismos". Los contratantes pueden exigir el cumplimiento específico con las cláusulas y condiciones pactadas. *Casera Foods v. E.L.A.*, 108 DPR 850 (1979). "Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas". Código Civil de 1930, *supra*, Artículo 1233. Los contratantes se "obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las

---

[21] Aunque el Código Civil de 1930 fue derogado tras la aprobación del Código Civil de 2020, Ley Núm. 55-2020, (31 LPRA sec. 5311 *et seq.*), hacemos referencia al Código Civil de 1930 puesto que estaba vigente al momento de los hechos del presente caso.

consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley". *Íd.*, Artículo 1210.

Cuando una parte no cumple lo pactado, incurre en incumplimiento contractual. "[L]a responsabilidad contractual se basa 'en el quebrantamiento de un deber que surge de un contrato expreso o implícito'. A través de las acciones *ex contractu* se vindican los daños acaecidos como consecuencia del incumplimiento de obligaciones previamente pactadas". *Rivera Sanfeliz et al. v. Jta. Dir. First Bank*, 193 DPR 38, 56 (2015) (citando a *Soc. de Gananciales v. Vélez & Asoc.*, 145 DPR 508, 521 (1998)).

Ahora bien, los contratos se desenvuelven "en tres fases o momentos principales: la generación, la perfección y la consumación". J. Puig Brutau, *op. cit.*, pág. 213. Es desde el momento que los contratos quedan perfeccionados que estos obligan a las partes. Código Civil de 1930, *supra*, Artículo 1210. Sobre el contrato de compraventa, el Artículo 1339 del Código Civil de 1930 dispone que "[l]a venta se perfeccionará entre comprador y vendedor, y será obligatoria para ambos, **si hubieren convenido en la cosa objeto del contrato, y en el precio**, aunque ni la una ni el otro se hayan entregado". Por lo tanto, una compraventa se considera perfeccionada luego de haber convenio entre las partes sobre el objeto y el precio; esta no depende de la entrega del objeto, por lo que la entrega antes de que haya convenio sobre el precio no perfecciona el contrato.

El tratadista José Ramón Vélez Torres señala que lo importante en la fijación del precio es que este "esté determinado al comienzo del contrato, o sea susceptible de determinación posterior, mediante la fijación del mismo por un tercero". J.R. Vélez Torres, *Curso de Derecho Civil: derecho de contratos*, San Juan, Ed. Rev. Jur. U.I.A., 1990, T. IV, Vol. II, pág. 157. De esta forma, en el contrato de compraventa, el **comprador solo está obligado a pagar el precio pactado**. Esto

puesto que el contrato debe cumplirse específicamente según las condiciones pactadas.

Por otro lado, un contrato de compraventa puede requerir que se cumplan con unas condiciones para que se dé su perfeccionamiento. Esto es, puede haber requisitos para que se formalice un contrato de compraventa. El Artículo 1066 del Código Civil de 1930 señala que "[s]erá exigible desde luego toda obligación cuyo cumplimiento no dependa de un suceso futuro o incierto, o de un suceso pasado, que los interesados ignoren". "El referido estatuto establece la norma general de que las obligaciones son exigibles inmediatamente. Sin embargo, existen excepciones a esta regla general que son las llamadas *obligaciones condicionales*. En estas obligaciones las partes adquieren o pierden derechos, dependiendo de la ocurrencia del acontecimiento que constituya la condición". *Jarra Corp. v. Axxis Corp.*, 155 DPR 764, 772-773 (2001).

El Artículo 1067 del Código Civil de 1930 añade que "[e]n las obligaciones condicionales la adquisición de los derechos, así como la resolución o pérdida de los ya adquiridos, dependerá del acontecimiento que constituya la condición". El efecto es que "'[s]i la condición suspensiva se cumple, la obligación surge [...]. Si [...] no se realiza, el vínculo de derecho no llega a aparecer [...]'". *Meléndez v. Jiménez Realty, Inc.*, 98 DPR 892, 897 (1970) (citando a J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, 6ª ed. rev., Madrid, Ed. Reus, 1967, Tomo VIII, Vol. 1, pág. 367).

**B.**

El contrato de opción de compraventa no estaba expresamente en el Código Civil de 1930, por lo que debemos acudir a la jurisprudencia interpretativa para identificar sus requisitos.

Puig Brutau denomina este contrato como "el contrato con pacto de opción", puesto que considera que mediante este, "no se opta por optar, sino que la opción es la posibilidad de perfeccionar un contrato

previamente delimitado". J. Puig Brutau, *op. cit.*, pág. 321. Ante dicha interpretación, hablamos de un contrato de compraventa normal cuyo perfeccionamiento está supeditado a una condición pactada. En *Rosa Valentín v. Vázquez Lozada*, 103 DPR 796 (1975), nuestro Tribunal Supremo tuvo la oportunidad de definir los requisitos esenciales para un contrato de opción de compraventa. Primero, consideró las posturas de los tratadistas en torno al contrato de opción y concluyó que:

> Todos están de acuerdo en que es un contrato sujeto a término o plazo fijo, en que el titular del derecho objeto del contrato, a quien llamamos promitente o concedente, queda obligado frente a otra persona, que llamaremos el optante, a hacerle reserva exclusiva del derecho que es objeto de la opción.

*Íd.*, pág. 807.

Además, determinó que se trata de un contrato unilateral, puesto que "el optante no está obligado a nada[;] que tiene libertad absoluta para tomar o no tomar la cosa ofrecida". *Íd.* (cita omitida). Lo atribuyó como un contrato preparatorio o precontrato, y que tiene los siguientes requisitos: (1) concesión por una parte a la otra la facultad de decidir sobre la celebración o no del contrato principal, sin obligación alguna de ésta, toda vez que la prima en el contrato, si alguna, es un elemento accidental; (2) concesión de modo exclusivo; **(3) por un plazo cierto**; y, (4) sin otra condición que el propio juicio del optante. *Íd.*, págs. 807-808. (Énfasis nuestro). De los requisitos esbozados, surge claramente que para que exista un contrato de opción de compraventa válido, las partes deben pactar un plazo fijo para ejercer la opción. De no tenerlo, no estamos ante un contrato de opción de compraventa.

## C.

Las obligaciones no solo nacen de los contratos, sino estas pueden surgir mediante las acciones de las personas. Nuestro ordenamiento jurídico reconoce las obligaciones que se contraen sin

convenio o cuasicontratos. Uno de estos es el denominado "enriquecimiento injusto".

El Código Civil de 1930 no regulaba la figura del enriquecimiento injusto. No obstante, si regula los cuasicontratos. El Artículo 1787 del Código Civil de 1930, *supra,* dispone que "[s]on cuasicontratos los hechos lícitos y puramente voluntarios, de los que resulta obligado su autor para con un tercero y a veces una obligación recíproca entre los interesados". Nuestro Tribunal Supremo ha reconocido que esta figura contempla el enriquecimiento injusto. *Ortiz Andujar v. ELA*, 122 DPR 817, 823 (1988). En aquella ocasión, tuvo la oportunidad de establecer los siguientes requisitos para que se dé un enriquecimiento injusto: (1) la existencia de un enriquecimiento; (2) un correlativo empobrecimiento; (3) una conexión entre el enriquecimiento y el empobrecimiento; (4) falta de justa causa que justifique el enriquecimiento; y, (5) la inexistencia de un precepto legal que excluya la aplicación del enriquecimiento sin causa. *Íd.* (citando a M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1984, T. XXIV, págs. 27-28).

**III.**

Con el derecho aplicable esbozado, nos encontramos en posición para resolver las controversias ante nos. Por versar sobre la existencia de un contrato válido, atenderemos los errores señalados en conjunto. En síntesis, la parte Apelante sostiene que el TPI erró al concluir que el *Contrato* no tenía un plazo cierto y en consecuencia, declararlo nulo.

Luego de analizar el *Contrato*, sus cláusulas y la totalidad de la prueba que obra en el expediente, concluimos que el TPI no erró al determinar que el *Contrato* adolecía de un plazo cierto. El *Contrato* dispone que la entrega de la Propiedad se hará luego de que la parte Apelante pague el restante $50,000.00 para completar el precio convenido de $125,000.00. Dicho plazo no puede ser considerado un plazo cierto puesto que era imposible conocer con certeza cuándo la

parte Apelante iba a pagar el restante. Al contrario, estimamos que este término es un plazo condicional e incierto, cuyo cumplimiento era necesario para que la Sra. Marrero se viera obligada a entregar el objeto de compraventa. Puesto que un plazo cierto es un requisito indispensable de un contrato de opción de compraventa, el TPI no erró al determinar que el *Contrato* entre las partes no es un contrato de opción.

Ahora bien, el TPI sí erró en declarar el *Contrato* nulo en su totalidad. Aun no siendo el *Contrato* uno de opción, sí es un contrato válido por cumplir con los requisitos básicos de un contrato de compraventa. Veamos.

En el caso de autos, el *Contrato* pactado por los Apelantes y la Sra. Marrero reúne los requisitos para ser considerado un contrato valido y ejecutable. Aquí, las partes pactaron la compraventa de la Propiedad por un precio fijo. El contrato de compraventa está definido por el Artículo 1334 del Código Civil de 1930, *supra*, que dispone que "[p]or el contrato de compra y venta uno de los contratantes se obliga entregar una cosa determinada y el otro a pagar por ella un precio cierto, en dinero o signo que lo represente". ¿Cuándo es que el contrato de compraventa se perfecciona y es ejecutable? Para contestar este interrogante, el Artículo 1339 del Código Civil de 1930, nos dice que "[l]a venta se perfeccionará entre comprador y vendedor, y será obligatoria para ambos, **si hubieren convenido en la cosa objeto del contrato, y en el precio**, aunque ni la una ni el otro se hayan entregado". (Énfasis nuestro). Por lo tanto, el perfeccionamiento del contrato de compraventa no depende de la entrega del objeto ni del dinero pactado, únicamente depende del convenio entre las partes para entregarse las contraprestaciones acordadas.

Mediante el *Contrato*, las partes manifestaron sus voluntades y consintieron a la compraventa de la Propiedad. El TPI estimó que no quedaron probadas las alegaciones atacando el consentimiento

otorgado por la Sra. Marrero y no existe duda sobre la voluntad de la parte Apelante. Además, hubo convenio sobre un bien especifico, lícito y en el tráfico jurídico, por lo que el *Contrato* reúne los requisitos de objeto, consentimiento y causa necesarios para su validez. Ante esto, el TPI erró al declararlo nulo.

Teniendo ante nos un contrato de compraventa válido, los contratantes tienen derecho a exigir el cumplimiento estricto con sus condiciones. Los Apelantes sostienen que tienen toda intención y voluntad de pagar los restantes $50,000.00 para cumplir con lo pactado y llevar a cabo la opción en su totalidad y exigir que la parte apelada entregue la Propiedad, según sus cláusulas. Dicho deber por parte de la Sra. Marrero, y ahora su heredera la Sra. Pagán, nació en el 2011, cuando los Apelantes le informaron a la Sra. Marrero de su intención y habilidad de entregarle los restantes $50,000.00. Es importante recordar que los Apelantes ya habían depositado $75,000.00 en una cuenta del Banco Popular en calidad de pago adelantado o depósito. Según las cláusulas pactadas, dicho depósito sería acreditado al precio final para la compraventa. No obstante, la Sra. Marrero, por razones desconocidas, no aceptó el dinero, reteniendo los $75,000.00. Los Apelantes intentaron infructuosamente comunicarse con la Sra. Marrero posteriormente.

El *Contrato* contiene una cláusula que dispone lo que debe suceder si el mismo no puede ser cumplido. Cuando el incumplimiento se debió al desistimiento por parte de los Apelantes, la parte vendedora se verá obligada a devolver el depósito, pero tendrá derecho a retener $10,000.00. Por otro lado, cuando el incumplimiento no es atribuible a los Apelantes, la parte vendedora se verá obligada a devolver la totalidad del depósito, entiéndase $75,000.00. En el caso de autos, el TPI declaró nulo el *Contrato* pero nada dispuso de los $75,000.00 dados en depósito. Al no existir causa por la retención de este dinero, esto constituye un enriquecimiento injusto por parte de la Sra. Pagán.

En resumen, revocamos la *Sentencia Parcial* del TPI. Aunque Tribunal no erró al determinar que el *Contrato* no es uno de opción, sí erró al declararlo nulo. El *Contrato* cumple con los requisitos para constituir un contrato de compraventa válido y perfeccionado. Los Apelantes tienen derecho a exigir el cumplimiento estricto con sus condiciones. De no poderse cumplir, procedería la aplicación de la Quinta Cláusula del *Contrato* y la devolución de los $75,000.00 entregados en calidad de depósito.

## IV.

Por los fundamentos discutidos, revocamos la *Sentencia Parcial* del TPI. Devolvemos el caso al TPI para que continúen los procedimientos conforme lo aquí resuelto.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones